Argued June 6, affirmed July 6, 1951

# HOLT ᴇᴛ ᴜx. *v.* CITY OF SALEM and P. G. E. CO.

**234 P. 2d 564**

201

*Bruce Spaulding,* of Salem, argued the cause for appellants. On the brief was William H. Trindle, of Salem.

*John J. Coughlin,* of Portland, argued the cause for respondent, Portland General Electric Company. On the brief were Griffith, Peck, Phillips & Coughlin, of Portland.

No appearance for respondent, The City of Salem.

Before BRAND, Chief Justice, and HAY, LUSK and WARNER, Justices.

HAY, J.

Suit for a declaratory decree that an ordinance of Salem, Oregon, changing a portion of a Class I, Residential District Zone to Class III X, Restricted Business District Zone, is unconstitutional, and for an injunction.

Plaintiffs are the owners of residence property within an area of Salem which had been established as a Class I, Residential District Zone. On March 14, 1949, the defendant, Portland General Electric Company, an Oregon corporation engaged in the business of generating, selling and distributing electrical energy in Salem and elsewhere in Oregon as a public utility, filed with the city Planning and Zoning Commission (hereinafter called the commission) a petition seeking to have a portion of said Zone, described as Block 35, except the north 30 feet thereof, North Salem with Additions, changed from Zone I, Residential District, to Zone III X, Restricted Business District, to permit the construction thereon of a substation to facilitate the distribution of electric power in order to meet increased demands therefor by members of the public. A remonstrance against such change of zone was filed with the commission, and thereafter, on April 19, 1949, the commission conducted a public hearing on such petition and remonstrance, and in due course recommended to the City Council that the change petitioned for be carried into effect. The council thereupon passed an ordinance (Ordinance No. 3978) chang-

ing the zone classification accordingly. The company then exercised an option which it held to purchase such Block 35, and began the construction of a substation thereon. On July 5, 1949, plaintiffs instituted this suit. The company thereupon suspended construction of its substation.

Plaintiffs, in their complaint, pleaded certain ordinances of the City of Salem, in particular, Ordinance No. 3628, as amended, which provided for the creation of the Salem Planning and Zoning Commission and defined its powers and duties, and for the establishment of zoning areas in said city. Further, the complaint recited the filing of the company's petition, the remonstrance thereto, and the hearings before the commission and before the council; alleged that by Ordinance No. 3628 it is expressly provided that if the owners of 50% or more of the area affected by a proposed change of zone object to such proposed change, then the council shall dispense with any further proceedings looking toward such change, and that, notwithstanding that there had been presented to the commission a remonstrance containing the names of over 57% of the owners in the affected area against the allowance of the petition, the council ignored such remonstrance, and on May 24, 1949, passed and adopted an ordinance putting the change of zone into effect. It alleges further that the latter ordinance was not necessary or convenient for the preservation of the public health, safety, comfort and general welfare of the citizens of Salem, but, on the contrary, was arbitrary, discriminatory, unconstitutional, null and void, in that it discriminated against plaintiffs and others similarly situated, in granting to defendant company rights and privileges which are denied by the general zoning

ordinance to plaintiffs and others similarly situated; and that the erection of a substation on said Block 35 will especially damage and injure plaintiffs in that it will be situated immediately in front of premises owned and occupied by plaintiffs as a residence, will cause the value of such premises to be greatly depreciated, and will interfere with plaintiffs' use and enjoyment thereof as a residence.

Defendant company answered by general denial, with certain formal admissions. Affirmatively, it alleged in effect that its petition requesting a change of zone was signed by owners of more than 50% of the affected area; that certain owners of property within the affected area, after having signed the petition, were interviewed by plaintiffs, and, within the time for filing remonstrances to said zone change, attempted to withdraw from the petition and object to the zone change; that such petitioners were induced to attempt to change their position by plaintiffs having misrepresented to them the effect of the proposed zone change, and, except for such misrepresentation, would not have done so; that certain signers of the remonstrance against the petition did not have authority to sign; that less than 50% of the owners of real property in the affected area filed valid remonstrances with the commission or with the council; that, before consideration of the zone change by the council, many of said owners filed affidavits with the council eliminating themselves from the remonstrance or reiterating their approval of the proposed zone change; and that neither the commission nor the council had lawfully before it any authorized and legal remonstrance signed by more than 50% of the owners of real property within the affected area.

As a second affirmative defense, the company alleged that, pursuant to the ordinance authorizing said change of zone, it had expended moneys upon and made plans for the erection of its substation; that delay in the construction and operation of such substation would entail further expense and would prevent the introduction of needed electric service in the area to be served thereby, and that plaintiffs had been guilty of laches in delaying unreasonably the institution of this suit.

For a third affirmative defense, the company alleged that the provisions of the zoning ordinances requiring the suspension of proceeedings for a change of zone upon the filing of certain remonstrances were unconstitutional, void and of no effect. A reply by plaintiffs put in issue the allegations of the new matter in the answer.

After a hearing, the lower court, on October 12, 1949, entered a decree denying the injunction prayed for and dismissing the suit. Plaintiffs have appealed to this court.

■■ The council, or other legislative body of any incorporated city or town in Oregon, is authorized by law to divide the territory of the municipality into zones, within which the erection and maintenance of certain types of structures, and the carrying on of certain trades or callings, may be either prohibited or permitted. § 95-2401, O.C.L.A. It has been laid down as a cardinal principle of jurisprudence that any such restriction upon the use of private property may not be effected unless it tends in some degree to promote or secure the public health, safety, morals or general welfare. *Berger v. City of Salem,* 131 Or. 674, 679,

284 P. 273; *Page v. City of Portland,* 178 Or. 632, 637, 165 P. 2d 280. Lawful zoning is a proper exercise of the police power of the state. *Page v. City of Portland,* supra; *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 73 L. ed. 210, 49 S. Ct. 50, 86 A.L.R. 654, 657; Bettman, Constitutionality of Zoning, 37 Harvard Law Review 834, 845; Annotation, 117 A.L.R. 1119.

■ In the adoption of zoning regulations the council has a considerable latitude of discretion, and the courts will not interfere therewith unless the council's action was clearly unreasonable and arbitrary, and had no substantial relation to the legitimate objects sought to be gained, i. e., the furtherance of the public health, morals, safety or welfare. *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 71 L. ed. 303, 47 S. Ct. 114, 54 A.L.R. 1016; *Nectow v. City of Cambridge,* 277 U.S. 183, 72 L. ed. 842, 48 S. Ct. 447, 448; *Kroner v. City of Portland,* 116 Or. 141, 150, 151, 240 P. 536; *Page v. City of Portland,* supra, at p. 639; McQuillin, Municipal Corporations, 2d ed., Rev. vol. 3, § 1030.

The general zoning ordinance of the city provides two distinct methods for change of zone. These are: (1) By the council, upon its own initiative, after a public hearing, provided that the owners of 50% or more of the affected area do not object in writing prior to the time set for the hearing; and (2) by the council, upon petition by the owners of 50% or more of the affected area, including not less than 50% of the area of the proposed change, provided that a remonstrance in writing against the granting of the petition is not made prior to the time set for the hearing by over 50% of the owners of property in the affected area.

In the present instance, the company followed the method of proceeding by petition, and plaintiffs concede that the required formalities in respect of notice and hearing before the commission and the council were duly observed.

It is important to determine exactly what constituted the "affected area" in this case. The ordinance provides:

"'Affected Area', when applied to local option uses or a change of use zone, shall be deemed to include the area bounded by lines three hundred (300) feet from and parallel to the boundaries of the area to be changed, including the width of all streets and alleys in such affected area."

It was stipulated at the hearing that the affected area in this case contained 391,041.3 square feet, exclusive of property owned by the Oregon Electric Railway Company, by A. W. Loucks and Irene Loucks, by C. H. Sanders and Edna Sanders, and the property as to which a zone change was sought. The railway company's property comprised 22,265 square feet, the Loucks and Sanders properties 14,380 square feet, and the zone change property 53,523.3 square feet. The railway property comprised a portion of its railroad right of way, and represented a nonconforming use, in existence prior to the creation of the zone. The plaintiffs contend that such property should not be considered as part of the affected area. They contend likewise that the property as to which a change of zone is sought should also be disregarded in that connection. The ordinance provides:

"If there is property within the boundaries of the affected area as herein determined in a like or less restrictive zone than that to which it is

proposed to change the area described in the petition, this property shall not be deemed a part of the affected area for the purpose of the proposed change. * * *''

■ The railway property is physically within the boundaries of the affected area. The plaintiffs maintain, however, that it is in a less restrictive zone than that to which it is proposed to change the area described in the petition, and therefore must be disregarded. We do not agree. The property is in a Class I, Residential District. It is permitted to exercise a nonconforming use, but, if such use should be changed, extended or abandoned, the property will immediately be subject to the full residential zone restrictions. It is a part of the affected area. Although it may seem anomalous to permit the owner of nonconforming use property to participate in such a proceeding, we have concluded that the language of the ordinance in that connection is not ambiguous and that we are bound by its terms.

■ The area as to which a zone change was sought is likewise physically within the boundaries of the affected area as laid down by the ordinance. It is true that the location of such boundaries is determined by that of the boundaries of the area of the proposed zone change, but the latter are not made inner boundaries of the affected area. This fact is emphasized by the following language taken from that section of the ordinance which lays down the procedure for change of zone:

"* * * The petition shall be signed by the owners of fifty (50%) percent or more of the affected area in which a change is to be made, including not less than fifty percent (50%) of the area to be changed.''

In our opinion, the affected area is as follows:

| | Square feet |
|---|---|
| Area as stipulated, exclusive of Railway, Loucks and Sanders properties | 391,041.3 |
| Oregon Electric Railway Co. property | 22,265.0 |
| Zone change area | 53,523.3 |
| Total affected area | 466,829.6 |

The Loucks and Sanders properties, with a combined area of 14,380 square feet, were not considered within the total of the affected area, apparently for the reason that they had previously been changed from Zone I, Residential District, to Zone III, Business District. They are occupied respectively by a filling station and a self-service laundry. The petition for change of zone was signed by owners representing a total of 290,504.9 square feet within the affected area, or more than 50% of the whole area.

 The signature of Oregon Electric Railway Company was affixed to the petition by W. P. Garrett, Right of Way Agent and Tax Agent. It is objected that Mr. Garrett was not shown to have been a duly authorized officer or agent of the railway company. There was evidence that he had been connected with the company since June 21, 1912, having been in the engineering department for 30 years, and right of way agent and tax agent since 1942. He was familiar with the functions of such agencies, having all the real property of the company under his supervision. He had authority to sign leases, permits, contracts and petitions, had done so many times, and his predecessor had done the same thing for many years. That was a part of his regular duties. Plaintiffs suggest that the

authority of an agent may not be proved by his own testimony. This is a common misconception. The authority of an agent may not be proved by his mere extrajudicial declarations, but his testimony as to his agency and the extent thereof is competent. *Ramsey v. Wellington Co.*, 114 Or. 355, 368, 235 P. 297; 3 C.J.S., Agency, § 322. We are satisfied that the authority of Mr. Garrett, who signed the petition, was sufficiently established.

Questions were raised respecting the authority of certain signers of the remonstrance who signed on behalf of owners, and of whether or not certain others signed by reason of misrepresentations made to them by one of the plaintiffs. We need not discuss these questions, as it was stipulated that the total square footage represented by the remonstrance was 226,381, which is less than the required 50% of 466,829.6 square feet, the total measurement of the affected area.

■■ It was stipulated further that certain of the petitioners signed in due time a remonstrance requesting that their names be withdrawn from the petition. In this connection, the general zoning ordinance provides that no petitioner for a change of zone shall be permitted to withdraw his name from the petition unless his request for withdrawal "is made within the time required for filing a remonstrance petition, [i. e., at or before 5 o'clock p. m. on the day immediately prior to the date set for public hearing before the commission] and then said withdrawal shall have no legal effect as to said petition unless the commission is satisfied that the person requesting his name withdrawn from the petition, signed the original petition for a change of zone as a result of misrepresentation of facts, undue influence or coercion and for no other reasons."

There was no evidence that any of such petitioners claimed to have been induced to sign the petition through misrepresentation of facts, undue influence or coercion. We hold, therefore, that they were not entitled to withdraw their names, and that the legality of the petition was not affected by such attempted withdrawal. They would, however, with other persons particularly interested and the general public, have an opportunity to be heard before the commission, and also before the council previous to final action being taken upon the petition by the council.

 It is argued that the ordinance effecting the change of zone is unconstitutional, as it was passed merely to accommodate the private interests of the defendant company, and had no reasonable relation to the furtherance of the public interests. We disagree. Every public utility is required by law to furnish adequate and safe service, equipment, and facilities. § 112-407, O.C.L.A. Plaintiffs called as their own witness Mr. Samuel J. Pearson, superintendent of "outside" divisions, including the Salem area, for the defendant company. Mr. Pearson is a registered professional engineer. He testified that he had "something to do" with the selection of the site for the substation. He detailed the specifications of the substation, and said that its construction would entail an expenditure of about $200,000. The company was receiving electrical energy from a Bonneville substation, but the Bonneville people were terminating the service. This was one of the primary reasons making necessary the construction of the new substation, which will take care of local distribution in that part of Salem. It will affect the entire city, more or less, but primarily the north and northwest area. It will replace the

capacity which the company will lose at the Bonneville substation in North Salem. The site in question was the only piece of property that the company could find in that section of Salem that would fit their needs.

"A But there was no property available. In other words, the substation has been located within reasonable limitations. You can only distribute within certain districts so you have to find a location somewhere near the center, and there was no property of adequate size available except this one piece, and we went out and looked for property. We figured we would not want to build a substation in a residential zone, and we went over that section of Salem with a fine-tooth comb, and this lot actually had a For Sale sign on it, and they usually don't, and we checked up to find out what zone it was and we tried to find something where it wouldn't require a zone change, and we gave up. That was a good piece of property, and it is the only thing available that will take care of us. There is actually two or three things that you have to have to fit the requirements of a substation, and this piece of property just happened to fit. * * * * * * * *

"Q * * * Now, with that I want to repeat my question,—if you know of any reasons why the change of this zone and the installation of this transformer were necessary for the benefit of peace, happiness and general welfare of the community served immediately around there,—that is, we will say, the affected area? A To give them better service than they are getting now.

"Q And that is the only reason? A And it will take care of the increasing needs.

"Q That is the only thing you can think of, that it is going to give those people better service. A You can't build a substation that would just take care of a small area like this so-called affected area. That is probably unfortunate we do have to

build in residential districts, but if we couldn't build in a residential zone it would be impossible to serve some areas, because you are limited to how far you can transmit your energy in the lower voltage and built-up areas; and it is possible to conceive of people preferring to have a substation rather than putting up with poor service."

As a witness for the company he testified in part as follows:

"Q What will happen if and when Bonneville cuts you off, as you have just described, in this affected area? A We will be in a pretty tough spot. I mean this is an impossible situation. It couldn't be done if that is discontinued and service —we wouldn't be able to carry that load in Salem.

"Q Is one of the reasons for building that substation to correct that situation? A Yes."

Mr. Pearson testified further that the electric load in the area around the proposed substation had grown by "leaps and bounds" in the past few years; it had tripled in the last four years. This, in our opinion, tended to indicate such a substantial change of conditions as to justify the change of zone. Whether or not the substation was required to be "pin-pointed" in the exact location which the company selected, it is evident that it had to be in that general location, and that the property in question was the only available one that fitted its needs.

■ We think that the question of whether or not the evidence showed such a substantial change in conditions as to warrant the change of zone was "fairly debatable." That being so, this court will not interfere with the council's decision. *Euclid v. Ambler Realty Co.*, supra, 272 U.S. 365, 71 L. ed. 303, 47 S. Ct. 114, 54 A.L.R. 1016, 1025; *Page v. City of Portland*, supra,

178 Or. 632, 639, 165 P. 2d 280; *Michigan-Lake Bldg. Corp. v. Hamilton,* 340 Ill. 284, 297, 172 N.E. 710; Annotation, 86 A.L.R. 667.

Finally, plaintiffs assert that the change of zone in this case is an example of "spot zoning," and hence illegal. In this connection, they quote from Yokley, Zoning Law and Practice, as follows:

"* * * Cases become 'spot zoning' cases where obviously a particularly small lot or parcel of ground is singled out and placed in an area, the use of which is inconsistent with the small lot or area so placed and whose classification is changed in the ordinance, and in these cases *where special benefits are sought to be conferred on a particular property owner, or special burdens sought to be imposed upon particular property owners, these and these alone, in our way of thinking, become the real 'spot zone' amendments* and they alone constitute the cases that sabotage the laudable efforts of progressive municipal authorities to comprehensively zone the municipalities and drag down into the dust such praiseworthy undertakings."

The author goes on to say that the law is well settled that "spot zoning", as properly known and understood, and "spot zoning" ordinances, as properly identified, are unconstitutional and void on the general ground that they do not bear a substantial relationship to the public health, safety, morals and general welfare.

■ The zone-changing ordinance under consideration here is definitely related to the health, safety, morals and general welfare, both of the restricted district and of the city at large. Such an ordinance is not "spot zoning" in its reprehensible and unconstitutional sense. *Page v. City of Portland,* supra, 178 Or. 632, 642, 165 P. 2d 280; *Polk v. Axton,* 306 Ky. 498, 208

S.W. 2d 497, 500; *Edgewood Civic Club v. Blaisdell,* 95 N.H. 244, 61 A. 2d 517, 518; *Higbee v. Chicago, B. & Q. R. Co.,* 235 Wis. 91, 292 N.W. 320, 323; *City of McAllen v. Morris,* C.C.A. Tex., 217 S.W. 2d 875, 877; *People v. Walsh,* 248 N.Y.S. 753, 756, 140 Misc. Rep. 25.

We are of the opinion that there was no error in the decision. The decree is affirmed. No costs to either party.