Argued January 13, reversed March 31, 1954

SHAFFNER ET AL. *v.* CITY OF SALEM ET AL. AND
RICHFIELD OIL CORPORATION

268 P. 2d 599

*Harry J. DeFrancq,* of Portland, argued the cause for appellants. With him on the briefs were Koerner, Young, McColloch and Dezendorf, of Portland.

*Fred A. Williams,* of Salem, argued the cause and filed a brief for respondents.

Before LATOURETTE, Chief Justice, and WARNER, LUSK, BRAND, TOOZE and PERRY, Justices.

WARNER, J.

This is an appeal from a proceeding brought for a declaratory judgment to test the validity of ordinance No. 4287 of the city of Salem and to restrain the de-

fendants Richfield Oil Corporation and Henry Camp from constructing a service station upon the premises described in that ordinance on a lot situated at the northeast corner of the intersection of Shipping street with North Capitol street, a part of highway 99E in said city (hereinafter referred to as Lot 5). The effect of ordinance No. 4287 (hereinafter called the zone ordinance) was to change the previously prevailing zone classification from Class II Residential District to Class III-X Restricted Business District. The "restriction" characterizing the latter classification was a limitation to use as an automobile service station with a set-back requirement. Plaintiffs were owners of various parcels of real property in the vicinity of that described in the offending ordinance. From a decree favorable to plaintiffs, the defendants named appeal.

Ordinance No. 3628 (hereinafter called the zoning code) was originally adopted by the city in 1944, pursuant to the authority granted by title 95, ch 24, OCLA (§§ 95-2401 to 95-2408 [ORS 227.210 to 227.300]) and in its overall character classified all property in the city as being within one of the zones therein designated. It also provided for the manner of changing from time to time the zone classification of a given parcel or group of parcels.

Following the procedures directed by the zone code, Nelson & Nelson, a local firm of real estate brokers, in August 1951 filed with the secretary of the Salem Planning and Zoning Commission (hereinafter called the Commission) a petition to change the zone classification of the subject property from Class II Residential District to Class III Business District. The petition was signed by the owners of 67 per cent of

the property in the "affected area", which is defined by § 1(5) of the zoning code as follows:

> " 'Affected Area', when applied to local option uses or a change of use zone, shall be deemed to include the area bounded by lines three hundred (300) feet from and parallel to the boundaries of the area to be changed, including the width of all streets and alleys in such affected area."

In due course the Commission in executive session determined to reject the petition unless it was amended to request a change from Class III to Class III-X and to grant the applicant the right to so amend. This was accomplished by Nelson & Nelson through the filing with that body of a letter in the nature of an amendment, together with the data required by § 23 of the zoning code. Class III zoning is more generous than Class III-X as to the kinds of businesses permitted within its boundaries. It countenances not only automobile service stations but many other kinds of business and does not require the set backs mandated by Class III-X.

On September 18, 1951, after due notice a hearing was had before the Commission. There being a want of sufficient remonstrances to circumvent action, the Commission made a report to the city council favorable to the petition as amended. The city council then gave due notice of a hearing before it, set for October 8, 1951. At that time and in the absence of written remonstrances by the owners of 50 per cent or more of the affected area, the council passed and adopted the zone ordinance, placing the subject property in Class III-X.

The appeal attacks the findings of the court in two respects: (1) the holding that there was a want of a valid petition for a change in the zone classification

from Class II to Class III-X and (2) that the zoning ordinance was not in the furtherance of the public interest and welfare.

The challenge to the validity of the instant zone ordinance is predicated upon two propositions. The first is that there was no amended petition before the Commission seeking a change from Zone II to Zone III-X. Although not clearly stated, this position seems to rest upon a repudiation of the Nelson letter as an efficient amendment to the first filed petition requesting a change from Zone II to Zone III and apparently for the reason that the letter of amendment was not subscribed to by parties who had signed the original petition. The second proposition is that the city council gave an insufficient notice of its impending action on the subject ordinance.

We find it unnecessary to pass upon the question of the efficacy of the amended petition before the Commission for the reason that the subsequent action of the city council, after receiving the Commission's recommendations in the premises, step-by-step conformed to the requirements of the zone code with respect to zone changes initiated by the council on its own motion.

The zoning code provides two methods whereby zone classifications may be made. One is by the council on its own initiative after notice and a public hearing. The other is by a petition signed by the owners of 50 per cent or more of the property in the affected area in which a change is to be made, including not less than 50 per cent of the area to be changed. Such a petition is filed with the Commission. After due investigation, notice and hearing the Commission transmits its report and recommendations to the city council for such action as it deems appropriate (§ 23 of the

zoning code, as amended). It acts in the premises solely in an investigative and advisory capacity.

Except for the alleged irregularity of the amended petition, no other charge is made that all the procedures up to the filing of the Commission's report were not in accordance with the requirements of the zoning code.

Subsequently, the council proceeded in the matter as if the proposed zone change had originated with it, that is, after giving the required notices and holding a hearing, the zoning ordinance was adopted. Only one challenge is made to this phase of the record. The plaintiffs erroneously contend that the notice of hearing should have been published 20 days instead of 10. This contention rests upon the wording of the zoning code as originally drawn. Prior to the passage of ordinance No. 4287, it had been amended, reducing the time for publishing notices to ten days.

We find that from a procedural standpoint, the contested zone ordinance was regularly adopted.

The most important cause of this appeal is predicated upon the lower court's finding that the change of the zone classification to Class III-X is not connected with the public health, safety, morals or general welfare of the city of Salem.

■ The subject of municipal zoning is relatively new. It did not become a part of our own jurisprudence until 1919 (§§ 95-2401 to 95-2408, OCLA). Its novelty and its inherent nature dictate that it should not be encumbered with many rules too hard and too fixed whereby the illegality of zoning acts can be quickly determined and announced. To the contrary, the validity of a given zoning plan "must depend upon the circumstances of each case and the character of the reg-

ulation, whether arbitrary or reasonable and whether really designed to accomplish a legitimate public purpose." *C. B. & Q. Railway v. Drainage Comm'rs,* 200 US 561, 592, 50 L ed 596, 26 S Ct 341. No doubt, the flexibility demanded in large part springs from the fact that zoning is not static. "* * * It changes with changed conditions and the complexities of a modern age. If the rule were otherwise, there could be no progress. * * *" *Page et ux. v. City of Portland et al.,* 178 Or 632, 638, 165 P2d 280.

There are, however, some rules already laid down by this and other courts which compel notice and application here in our determination of the validity of the instant zoning ordinance.

■ In the adoption of zoning regulations, the legislative body, usually a city council, has a considerable latitude of discretion. The courts will not interfere unless the action was clearly unreasonable and arbitrary and had no substantial relation to the legitimate objects sought to be gained, i.e., the furtherance of public health, morals, safety or welfare, and will not review it if the question is fairly debatable. *Holt et ux. v. City of Salem et al.,* 192 Or 200, 207, 234 P2d 564; *Page et ux. v. City of Portland et al.,* supra.

In 8 McQuillin, Municipal Corporations 3d ed, 68, § 25.40, we find:

"The constitutionality and validity of zoning depend essentially upon a reasonable balancing of public interest in zoning as against opposing private interests in property. * * * That is to say, the theory is to foster improvement by confining certain classes of buildings and uses to certain localities without imposing undue hardship on property owners. * * *

"On the one hand, the detriment to public wel-

fare that would result if zoning restrictions were removed must be weighed against benefit that would accrue to individual property owners. On the other hand, in determining the reasonableness of the assertion of public interest through zoning against private personal and property rights, consideration must be given to the extent to which property values are diminished by zoning restrictions, to the character of the neighborhood, and to the use being made of nearby property, and if the gain to the public is small when compared with the hardship imposed upon property owners then no valid basis for exercise of the police power through zoning exists. * * *''

■ A presumption of validity and reasonableness attends zoning ordinances and amendments thereto. In 8 McQuillin, supra, p. 559, § 25.295, it is further said:

"The presumption of the reasonableness, validity and constitutionality of ordinances applies fully to zoning ordinances and amendments of zoning ordinances. Every intendment in favor of their validity is to be indulged. This is particularly true since zoning is governmental and legislative in character, and constitutes an exercise of the police power to promote the public welfare. It is presumed that the zoning power has been exercised reasonably by the zoning ordinance and that the ordinance is for purposes and within the scope of the police power. That is to say, it is presumed that such an ordinance is designed to promote the public welfare. The court will presume that in enacting a zoning ordinance the city council acted with full knowledge of relevant conditions and circumstances. * * *''

Also see *Holt et ux. v. City of Salem et al.*, supra, at p. 207; *Page et ux. v. City of Portland et al.*, supra, at p. 639.

■ The burden of proof rests upon those challenging the validity of the ordinance and as stated in 8 McQuillin, supra, p. 562, § 25.296:

> "The rule that the burden of proof is on one asserting the unreasonableness, invalidity or unconstitutionality of an ordinance is applicable with respect to zoning ordinances and amendments thereto. Leastwise, where a zoning ordinance is not invalid on its face, the burden of alleging and proving facts to support the claim of its invalidity is on the party asserting it. * * * Consistently, there is no burden on a municipal corporation to show facts establishing the validity of zoning.
>
> "The burden of proof on one asserting the invalidity of a zoning ordinance extends to the issue of whether or not the ordinance will promote the public safety, health, morals, order, welfare, prosperity or convenience, and it extends to the issue whether or not the classification made by the ordinance is unreasonable, arbitrary or discriminatory. * * *"

The proof to be sufficient must do more than make the invalidity of the ordinance doubtful. 8 McQuillin, supra, p. 558, § 25.294.

■ The plaintiffs contend that the ordinance under review exemplifies "spot zoning" and that as such it is illegal. It is true that as a general rule, so-called "spot zoning" is invalid. *Page et ux. v. City of Portland et al.,* supra, at p. 642. However, as we said in the Page case, "We do not wish to be understood as announcing a hard and fast rule that 'spot zoning' is illegal. Obviously, the decision in each case depends upon its particular facts." We adhere to that statement.

Spot zoning in its least savory sense is not present here. It is true that the property which the instant

ordinance seeks to transfer from Zone II to Zone III-X is a single corner lot of one block in that zone, but the block in which it is situated is but one of ten blocks in the affected area. This area is more or less evenly divided by North Capitol street running in a northerly and southerly direction. It is one of the heavy-traffic streets of the city, with scattered and various businesses along the east and west sides of the street. Some of these business establishments are a direct result of changes in classification made since the adoption of Salem's zoning code.

We will first refer only to those business locations within the affected area, as defined for the purpose of qualifying petitioners or remonstrators under that code.

On the west side of Capitol street in the block south of the intersection of Capitol street and Shipping street, we find a substantial business building occupied by an insurance firm. This was authorized as a result of a petition filed within 18 months prior to the adoption of contested ordinance No. 4287 and effected a change from Zone II to Zone III-X. It is situated on a lot 80 feet south from the intersection upon which Lot 5 is located. Within two years prior to the passage of ordinance No. 4287 a parcel on the east side of Capitol street and at the intersection of that street with Hood street, one city block or 256 feet south of Shipping street, was taken from Zone II and placed in Zone III-X. The building subsequently erected thereon is now occupied by an ice cream store.

We now point to some other properties on Capitol street not in the affected area but sufficiently contiguous thereto to give an express business character to the areas along that street.

Three blocks south of Lot 5 a lot abutting upon the east side of Capitol street at its intersection with Market street was given a Zone III-X classification about three years before the adoption of ordinance No. 4287. Thereafter and now, a substantial service station is operated on the property. Also at the northeast corner of the same intersection a grocery store and meat market are operated, pursuant to the same type of zone reclassification authorized by the instant ordinance and made long prior to its enactment.

Only a relatively short distance north of the northerly boundary of the affected area we find the southerly boundary of what is commonly called the Hollywood district—a thriving commercial center with many different types of business enterprises serving the public and residential district of which plaintiffs' property is a part.

■ Thus it is seen that the action of the Salem city council in adopting the offending ordinance does not create a "commercial island" in a residential area in the sense condemned in the Page case, nor is its spot zoning character vulnerable to successful attack when, as here, it is but one of many previously created areas of like kind with like business qualities and limitations. Indeed, if we limit our examination to that part of Capitol street lying within the bounds of the affected area, we find that during recent years it inclines more and more to business use and investment and with more than a probability that the so-called "commercial islands" now on its route will eventually coalesce into one large commercial area. This is emphasized by the presence of the business enterprises found close to the north and the south boundaries of the affected area on either side of that street.

This conclusion is pointed up by Mrs. Mabel Woelk, a witness for the plaintiffs, when she testified that "No one wants to buy a residence on the fringe of a business zone", and by the fact that no permits for the construction of residences on this segment of Capitol street have been issued during the past eight years. Such is also the tenor of the uncontradicted testimony of Theodore Nelson, an expert in property sales and utilization, who stated that there is no reasonable expectation of selling vacant lots on that part of Capitol street for residences or apartment courts.

We now turn to the case made by plaintiffs. Eight witnesses were called, all of them owners of property within the affected area. Two of the eight, that is, the plaintiff Mrs. Shaffner and her husband, were the owners of the same parcel, a lot immediately north of Lot 5, and the only witnesses having property abutting on Capitol street. The Shaffners rent their property and live elsewhere in Salem. The other six witnesses were owners of property in the affected area not abutting on Capitol street. Their testimony in the main followed the same general pattern of objections to the presence of a service station on Lot 5. Four, all living in Block 2 of which Lot 5 is a part, viewed it as a hazard to their children who commonly use as a playground the alleyway running east and west through the block. Five asserted that it would increase the one-way traffic on Capitol street. One witness added that it would add to the noise in the area. Only five claimed an unfavorable effect on the value of their property, variously expressing themselves. Mr. and Mrs. Shaffner limited themselves to impairment of rental values; Mr. Lindstrom said it would "Probably [cause] a decrease in value" and that "It will devaluate the property, without question"; Mrs.

Magnuson, another plaintiff, ventured that "the value of the property will naturally deteriorate, especially if certain types of business go in"; and Mrs. Woelk, in answer to whether or not her property would be damaged, responded, "Definitely." Mr. Weller, whose home is on Shipping street midway between Summer and Capitol, claimed he did not sign the petition because he "figured it would decrease the value of our property as residential property".

In these respective statements we have the essence of all the testimony regarding the alleged impact of the change in zone upon the particular properties referred to by the several witnesses for plaintiffs and whose generalized statements of value referred therein only to their particular holding. No expert testimony was adduced as to the extent, if any, that the values of their properties would deteriorate by reason of the zone change effected by ordinance No. 4287. No witness attempted to demonstrate in what way the general welfare of the city would be impaired by the council's action, or, indeed, the welfare of the area affected by the adoption of the ordinance.

We note that all the witnesses represent only seven separate parcel ownerships out of 65 parcels in the entire affected area, or, in terms of footage, approximately 13.2 per cent of the whole. We also observe that the initial petition for the change in zone classification represented 67 per cent of the entire ownership in the affected area. While these mathematical factors are in no sense controlling, they tend to give support to the thesis that if ordinance No. 4287 was in fact detrimental to the general community welfare, a more militant and cogent showing would have been made, rather than the weak presentation relied upon by the plaintiffs.

■ Taking plaintiffs' testimony as a whole, and each of the several phases of its presentation, i.e., the claim of hazard to a few children who employ the alley as a playground instead of the purposes of its dedicated use, the claim of increased noise, the claim of increased traffic on Capitol street, and the probable damage to a few parcels of residential property, we find that it is too vague, speculative and inconclusive to overcome the presumption which the law accords to the validity of a zoning ordinance.

The decree of the circuit court is reversed.

LATOURETTE, C.J., dissents.