John Dayton ROBERTSON, Plaintiff,

v.

CITY OF SALEM, an Oregon municipal
corporation, Defendant.

Civ. No. 73-59.

United States District Court
D. Oregon.

March 1, 1961.

Steve Anderson, Salem, Or., for plaintiff.

Chris J. Kowitz, Salem, Or., for defendant.

Robert Y. Thornton, Atty. Gen., State of Or., and Catherine Zorn, Asst. Atty. Gen., State of Or., amicus curiae.

EAST, District Judge.

## Parties in Jurisdiction

Plaintiff John Dayton Robertson (Robertson), is a citizen of the State of Washington, and Defendant City of Salem (Salem), is a municipal corporation duly existing under the laws of the State of Oregon (Oregon), and diversity of citizenship exists between the parties. Robertson seeks declaratory judgment relief herein, and this Court has held that a "justiciable controversy" exists between the parties and that it has jurisdiction.[1]

## Facts

Robertson is now and through his parental predecessors in interest has been continuously for many years prior to the year 1953 the owner in fee simple of two parcels of real property[2] within Salem and lying within the boundaries of "G1 Capitol District" (District), delineated and prescribed in the hereinafter mentioned Salem Ordinance No. 4578.

The structures situate on Parcel I consist of some 50-or-more-years' vintage residences and are presently used for multiple use housing of secondary, to say the least, standards, enjoying approximately one-half time occupancy. Parcel I is located along the north line of Center Street, N. E., and the west line of Capitol Street, N. E., and the residential units bear the addresses of 943–947, 955–959, 975–985 and 995 Center, and 415 Capitol Streets, respectively. Parcel I lies to the north and directly across Center Street from the most northerly of the recently constructed Oregon owned office buildings.

Parcel II is located along the north line of Marion and the west line of Capitol Streets, N. E. Marion Street is the first city street to the north of Center Street, hence Parcel II lies one city block north of the above-mentioned Oregon owned office buildings. The improvement on Parcel II consists of a duplex residential structure of more modern design than the units on Parcel I.

Center Street bounding Parcel I on the south is a state highway and a main traffic artery for eastbound traffic, being heavily traveled by both private and commercial vehicles. Capitol Street likewise is a state highway and a main traffic artery for northbound traffic and is heavily traveled by both private and commercial vehicles, and Marion Street is a main traffic artery for westbound traffic.

1. Opinion of Honorable Gus J. Solomon, United States District Judge, entered herein on October 28, 1959. Village of Euclid, Ohio v. Ambler Realty Co., 1926, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303; Dowsey v. Village of Kensington, 1931, 257 N.Y. 221, 177 N.E. 427, 86 A.L.R. 642. Title 28 U.S.C.A. § 2201.

2. Parcel I: Lot 5, and the east 50 feet of Lot 6, Block 87, Salem, Marion County, Oregon.
   Parcel II: East 113 feet Lot 5, and the east 113 feet of the south 8 feet of Lot 4, Block 88, Salem, Marion County, Oregon.

and is heavily traveled by both private and commercial vehicles. There are located within the same block as Parcel II and along the same side of Capitol Street three residential structures; a mortuary establishment; a service station; and an office building, the latter business uses being pre-existing, nonconforming uses under Ordinance No. 4578. The property fronting on the east side of Capitol Street from Court Street (one block south of Center Street) and extending northerly for approximately four and one-half blocks to Mill Creek (two blocks north of Marion Street), is now and has been for some time past under ordinance of Salem, zoned for commercial and business land uses.

### Zoning by Salem's Council

Oregon, through its Legislature, has provided that its cities, acting through their respective councils, may by ordinance:

"For the public interest, health, comfort, convenience, preservation of the public peace, safety, morals, order and the public welfare * * * create or divide the city into districts within some of which it shall be lawful and within others of which it shall be unlawful to erect, construct, alter or maintain certain buildings or carry on certain trades or callings * * *" O.R.S. 227.-220,

and

" * * * regulate, restrict and segregate the location of industries, the several classes of business, trades or callings, the location of apartment or tenement houses, clubhouses, group residences, two family dwellings, single family dwellings and the several classes of public and semipublic buildings, and the location of buildings or property for specified uses, and may divide the city into districts of such number, shape and area as the council may deem best suited to carry out the purposes of ORS 227.220 * * *" O.R.S. 227.230.

However, the cities are admonished that:

"These regulations shall be designed to promote the public health, safety and general welfare. The council shall give reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the direction of building development in accord with a well considered plan." O.R.S. 227.-240.

Salem is the hostess city of the State of Oregon [3] and as such is, understandably, hypersensitive to suggestions of the Legislature of Oregon. As early as February 2, 1939, the Legislature of Oregon made public its policy of seeking the cooperation and agreement of Salem with the objective of restricting future higher and better private development of land uses within the so-called Capitol area of Salem,[4] and, again, on February 21,

---

3. Constitution of Oregon, Article XIV "Section 1. Seat of government. The permanent seat of government for the state shall be Marion County."

4. Senate Joint Resolution No. 17, which provided:

" * * * * That it hereby is declared to be the public policy of the state of Oregon that the aesthetic values of any buildings or connected group of buildings now occupied, or hereafter to be occupied, by the principal executive, administrative, legislative and judicial branches of the state government as the seat of government of this state shall be carefully preserved and protected and the legislature of the state of Oregon does hereby recommend, in furtherance of such public policy, that no structure shall be erected, constructed or remodeled so that the same may be occupied or used for other than residential or educational purposes within a reasonable distance of the external boundaries of any real property now owned by the state or which the state is authorized by the legislative assembly to acquire and upon which any building or connected group of buildings now is, or hereafter may be, erected and occupied by the principal executive, administrative, legislative and judicial branches of state

1951, the Legislature of Oregon, for its own economic use at large, resolved as follows:

"Whereas a declaration by the State of Oregon of its intention to carry out this element of the plan would serve as a basis for the Capitol Planning Commission to request of the Salem common council such zoning of the area as would *give protection against construction within it of a nature that would add to the costs to be met in a program of acquisition* or of a type unsuited to the dignity of the state buildings nearby; now, therefore, * * * it hereby is declared to be the purpose of the State of Oregon to acquire ultimately and to include in the Capitol area for development all real property in the area north from Court Street to D Street between Capitol and Winter Streets in the City of Salem." Laws 1951, pp. 1171, 1172. [Emphasis added.] [5]

On October 29, 1953, the Council of Salem, pursuant to the requests of the Capitol Planning Commission and in cooperation therewith, adopted Zoning Ordinance No. 4578, designating an area of Salem as District,[6] and (so far as this case is concerned) bounded on the south by Court (two blocks south of Center), on the east by the west line of Capitol, and on the north by Division, if extended (approximately two blocks north of Marion), and on the west by the midblock line west of Winter (three and one-half blocks west of Capitol) Streets. Within the District, commercial and business activity and land use is prohibited and the land uses are restricted to:[7]

"(a) Any use permitted in an R2 residential (multiple) district, except churches and elementary or high schools;

"(b) Office buildings of any governmental unit."

Oregon now owns all that part of District lying south of Center Street and puts the same to governmental building uses. Oregon also has purchased and owns several isolated parcels or islands throughout the District not as yet being put to governmental building uses.

Robertson contends:

### I.

That Salem adopted Ordinance No. 4578 and delineated District's boundaries and restricted the land uses therein solely for the accommodation of Oregon, to prevent further economic development in the District, and to hold and freeze the area of the District for future acquisition by Oregon, all without the present payment of just compensation therefor. That such zoning was urged upon Salem's

---

government as the permanent seat of government of the state of Oregon; and be it further

Resolved, That the city of Salem, acting by and through the officers of its municipal government, does enact appropriate zoning regulations within its limits to best carry out the intent and purpose and the public policy expressed in this resolution." Laws 1939, pp. 1255, 1256.

**5.** As appears from excerpts from the Minutes of the Meetings of the Salem Planning and Zoning Commission and Council in evidence, and testimony of prior member of Salem's Planning Commission, the delineation of District and the restriction of land use therein under Ordinance No. 4578 was motivated by and based upon the mentioned legislative resolutions, reports and correspondence from the Capitol Planning Commission.

The Capitol Planning Commission, as a permanent agency of Oregon

" * * * shall inform the mayor and board of aldermen of the City of Salem, planning and zoning commission and the Salem long-range planning commission of the plan of the state in regard to the the capitol area, as such plan develops and matures. The commission shall make all possible effort to obtain the cooperation of such officers and commissions of the City of Salem for the purpose of establishing such zoning of that part of the city contiguous to the capitol area as will effectuate the purpose of the State of Oregon to maintain its administrative buildings in a continuous, park-like area, in appropriate environment." O.R.S. 276.040.

**6.** Sec. 4.01 of Salem's Ordinance No. 4578.

**7.** Sec. 16.01 of Salem's Ordinance No. 4578.

Council because of Oregon's desire to create a so-called "Capitol Zone" at the expense of the owners of the property in such area and without compensation for the impairment of use and partial taking thereof. That the sections of the ordinance creating the District and restricting the land uses therein are illegal, unconstitutional and void;

A. In general because:

1. They are arbitrary, unreasonable, discriminatory and class legislation;

2. They bear no reasonable relation to public health, safety and general welfare, and were adopted in violation of the provisions of Oregon Revised Statutes 227.220 and 227.240;

3. They establish an arbitrary classification distinguishing without reason between government and private office buildings;

4. They deprive plaintiff of his property without due process of law and constitute a denial of the equal protection of laws as guaranteed by the laws and Constitution of the State of Oregon.

B. As applied to plaintiff's respective properties because of the above general reasons and the following specific reasons:

1. The premises in question cannot be effectively used by plaintiff for residential purposes or governmental office buildings,—the uses permitted by said ordinance, inasmuch as the only reasonable use thereof is for business and commercial purposes;

2. They result in confiscation of plaintiff's property without payment of just compensation;

3. They create a lack of uniformity throughout an area of the defendant city which is in fact similarly constituted and bar commercial use from such zone while permitting such uses in adjoining similar property;

4. The beneficial use of the property is permanently so restricted that it cannot under the ordinance be used for any reasonable purpose;

5. Such limitation upon the use of said property greatly diminishes its value without benefit to public health, safety, morality or general welfare.

II.

That due to the locations of his respective parcels, they are not adaptable, valuable or profitably usable for the purposes restricted by Ordinance No. 4578 and that due to their location and its business and commercial uses of property in the immediate neighborhood, the reasonable and higher use and value of the properties are for commercial and business uses.

Salem contends:

I.

That the effect of Ordinance 4578 does not appreciably depreciate the market value of Robertson's parcels.

II.

That Ordinance No. 4578 is a reasonable and valid exercise of its authority pursuant to O.R.S. 227.220 et seq.

On the Merits

The Court finds from the evidence that the reasonable market value of Robertson's two parcels of real property have been substantially depreciated through the effect of Salem's District zoning thereof and that Robertson will sustain irreparable damage therefrom if maintained.

In determining the validity of municipal zoning ordinances, we have certain principles to guide us. The first of these is that a presumption of validity attends these ordinances, and the burden of proof of invalidity rests upon those challenging the validity thereof. The judgment of Salem's Council must be allowed to control if the reasonableness of the ordinance involved is "fairly debatable". Village of Euclid, Ohio v. Ambler Realty Co., 1926, 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303;

Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Airport Authority, Fla. 1959, 111 So.2d 439, 443, 444; Shaffner v. City of Salem, 1954, 201 Or. 45, 51, 268 P.2d 599.

■ A second general principle is that zoning laws must adhere to enabling statutes. Atherton v. Selectmen of Bourne, 1958, 337 Mass. 250, 149 N.E. 2d 232, 235. We again remind ourselves of the admonition in O.R.S. 227.240:

"* * * These regulations shall be designed to promote the public health, safety and general welfare. * * *"

■ It must go without saying that these statutes speak of the public health, safety and general welfare of the municipality exercising the zoning authority. And that conservation of property values and the direction of building development refers to the commerce and economy of the landowners within the area of the zoning authority. Whether Salem's ordinance under attack is supported by reason under its guise of "for the public interest, health, comfort, convenience, preservation of the public peace, safety, morals, order and the public welfare" of Salem, necessarily involves a determination of the constitutionality of the ordinance. The reason for this is that municipal zoning is an exercise of the police power of such municipality, and as such must bear some substantial relation to the general public welfare of that municipality. If Salem's ordinance under scrutiny does not do so, but instead is arbitrary and unreasonable and not a valid exercise of Salem's police power, then it is unconstitutional.

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct.

447, 448, 72 L.Ed. 842. See also Holt v. City of Salem, 1951, 192 Or. 200, 206, 234 P.2d 564; Mundelein Estates v. Village of Mundelein, 1951, 409 Ill. 291, 99 N.E.2d 144, 146.

So it goes that enforcement of an unreasonable zoning ordinance restricting land use, to the owner's damage, without payment of just compensation, presently violates the United States Constitutional guarantee that no person shall be deprived of his property without due process of law. In determining the reasonableness of any given governmental land-use restriction, the surrounding facts and circumstances of the situation must be taken into consideration. Among the factors bearing upon a decision are the following:

The character of the neighborhood;

Traffic conditions on adjacent streets;

The use to which nearby property is put;

The authorized land usage or zoning of nearby property;

The extent to which the value of the complaining landowner's property is diminished;

The effect which removal of restrictions would have on the value of other property in the area; and

The relative gain to the public as compared to the hardship imposed upon the property owner.

Krom v. City of Elmhurst, 1956, 8 Ill.2d 104, 133 N.E.2d 1; Sinclair Refining Co. v. City of Chicago, 7 Cir., 1949, 178 F.2d 214.

The evidence before the Court discloses:

(1) Except for the above described pre-existing, nonconforming commercial uses and state ownership, the privately-owned buildings located within the District are old residential-type buildings.

(2) Center, Capitol, and Marion Streets are main traffic arteries, as

aforesaid, and are heavily traveled by private and commercial vehicles.

(3) The properties directly across Capitol Street from Robertson's two parcels are zoned for and are now substantially devoted to commercial and business land usage.

(4) Within the same block as is Robertson's Parcel II, and on the same side of Capitol Street, are the pre-existing, nonconforming commercial and business uses, aforesaid.

(5) The zoning and land-use restriction imposed by the ordinance has substantially depreciated the value of Robertson's two parcels.

On the other side of the ledger, there is no evidence in the case that removal of the land-usage restrictions would adversely affect the value of any other properties in the area, nor is there any evidence that the public of Salem and the landowners in adjacent areas have received any gain, economically or otherwise, by reason of the zoning restriction, nor that the removal of the restriction would adversely affect the value of other properties in adjacent areas. By reason of the ordinance, therefore, there is no relative gain to the public of Salem, as compared to the hardship imposed upon Robertson and others similarly situated. The query immediately arises: What then is the reason or purpose underlying and motivating the adoption of the ordinance and resulting land-use restrictions upon the property within the District to:

(a) Multiple residential uses, or

(b) governmental office buildings uses?

It must be noted at this juncture that this District, together with the surrounding area, was originally zoned for residential uses; however, the District in the vicinity of Robertson's

parcels remains an island in a surrounding sea of commercial enterprises. It is conceded that the motives of a legislative municipal zoning authority such as Salem's Council is not subject to a judicial inquiry in adjudicating the validity of a zoning ordinance restricting land uses. Annotation 71 A.L.R.2d 568 (1960). On the other hand, it is not improper to judicially investigate "the real purpose, the object and the operative effect" of such an ordinance when laboring to determine its reasonableness. Board of Commissioners of State Institutions v. Tallahassee Bank & Trust Co., Fla.App.1958, 108 So.2d 74; Kissinger v. City of Los Angeles, 1958, 161 Cal. App.2d 454, 327 P.2d 10.[8] Inasmuch as a prime or major factor in determining reasonableness and validity of a restrictive zoning ordinance is whether the use restriction tends to advance some legitimate interest, the decisive question becomes: What matter of public interest or general welfare of the enacting society is served by prohibiting one of its members from using his property for business or commercial purposes, when his neighbor directly across a city street is permitted to do so? Of course, areas or districts must have some delineated boundaries, but the delineation must be made upon the basis of reasonableness, with the view as to what is for the best interest or the general welfare of the society involved. Otherwise, the delineation at any selected point is unreasonable, capricious and arbitrary.

Salem's brief contains an assertion that it could properly consider "the needs of the State of Oregon, together with reasonable control for the sake of beauty." If Salem's consideration on the one hand to the "needs of the State of Oregon" is intended to mean that Salem could depress the value of property with-

---

**3.** Plaintiffs sought a declaration of rights under an ordinance which rezoned their property from multiple dwellings to single family residential. Held, that spot zoning ordinance was invalid as arbitrary and discriminatory and as denying due process and taking property of plaintiffs

without payment of compensation where evidence established that the purpose of the ordinance was to depress the value of plaintiffs' property so that it might be acquired for municipal airport purposes at a depressed value.

in its limits so that Oregon could at some future date acquire it for its governmental uses at a depreciated market price and then, with the other hand, justify the land-usage restriction as being for Salem's general welfare, a stalemate is created, as the law is otherwise. The cases denounce such a maladministration of land-use restriction and zoning power and authority as being an unlawful device to take property for public use without the present payment of just compensation. Board of Commissioners of State Institutions v. Tallahassee Bank & Trust Co., supra; Kissinger v. City of Los Angeles, supra; Robyns v. City of Dearborn, 1954, 341 Mich. 495, 67 N.W.2d 718; State ex rel. Tingley v. Gurda, 1932, 209 Wis. 63, 243 N.W. 317.

Salem's justification of its Council's legislation on the basis of being a "reasonable control for the sake of beauty" deserves comment. There are many authorities holding that esthetic considerations are rightfully entitled to some consideration and weight when there are other reasons present for the exercise of the power, such as the promotion of health or safety. See Opinion of the Justices to the Senate, 333 Mass. 773, 128 N.E.2d 557; Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., 8 Cir., 1932, 58 F.2d 593, 603; State ex rel. Civello v. City of New Orleans, 1923, 154 La. 271, 97 So. 440, 33 A.L.R. 260. Both Salem and Oregon, appearing herein by brief amicus curiae, rely on Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 104, 99 L.Ed. 27. A perusal of that case reveals that it can be of no solace to Salem or Oregon. In fact, it should be a teaching that if Oregon desires Robertson's lands for a future public use, it should exercise its power of eminent domain and give Robertson just compensation, as dictated by the Constitution of the State of Oregon. Berman merely holds that the District of Columbia Redevelopment Act of 1945, D.C.Code 1951, § 5–701 et seq., wherein its administrative agency was given the power of eminent domain in the course of the re-

development of a large area of the District of Columbia so as to eliminate and prevent slum and substandard conditions, was constitutional and that the administrative agency had the right to acquire private property for such purpose by eminent domain, which includes the present payment of just compensation. The decision of the Supreme Court of the United States closes with these words:

"The rights of these (contesting) property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking."

That is all that Robertson is asking, else let him use his property as does his neighbor across the street.

Robertson contends that Salem's only purpose in establishing District at its delineated boundaries and imposing the land use restrictions thereunder was in response to Oregon's legislative request to depress the land values and prevent a higher and better economic use of Robertson's parcels preliminary to some future eminent domain proceedings by Oregon to acquire the property for its governmental uses. The evidence substantiates the point and leads one inescapably to agree with this contention.

The above mentioned resolutions of Oregon's Legislature, under dates of February 2, 1939, and February 21, 1951, the Minutes of the Capitol Planning Commission and the letters and communications of that Commission to the Salem Planning and Zoning Commission, all in evidence herein, are an indelible record of Oregon's selfish intentions and desires for its future pocketbook. And the acquiescence and subscription to this policy by Salem's Council is evidenced by the Minutes of its meetings, in evidence, and is likewise indelibly recorded in Sec. 1 of its Ordinance No. 4593, passed ·on November 23, 1953, wherein it is provided that no building permit shall be issued for improvements in the District until application therefor is approved by the common council. Section 2 of this ordinance prostrates Salem to the bid

of Oregon and interprets its prior Ordinance No. 4593 in these words:

"This section is enacted for the purpose of protecting the Capitol area, which the State of Oregon may eventually acquire, from invasion by buildings or enterprises *not* in harmony or keeping with plans of the State of Oregon or the Capitol Planning Commission and *to prevent costly and new construction of property which the State may acquire.*" [Emphasis supplied.]

### Conclusion

The conclusion is inescapable that Salem's Ordinance No. 4578, creating District, is clearly unrealistic and unreasonable so far as the general welfare of Salem is concerned, and its Council's legislative classification is not fairly debatable. Robertson, and other property owners in Salem similarly situated, are victims of discriminatory treatment, their individual losses and Salem's intervening loss of a higher and better economic use of property within its boundaries to be to Oregon's future gain. Surely, it is so plain that there can be no dissent that there exists no reasonable grounds for differentiating between property on the west side of Capitol Street from the property on the east side of Capitol Street, except to accommodate Oregon-at-large in connection with its long-time tentative plans of future acquisition of Robertson's property for governmental uses. The effect of Salem's Ordinance No. 4578 was, in the vernacular, merely to freeze the land uses within the Capitol area and to prevent otherwise normal economic growth to Salem, by way of private enterprising of higher and better uses of the land within the District.

■ Paraphrasing the language of Kissinger, this Court is of the opinion that Ordinance No. 4578 is arbitrary and discriminatory and that it is, in effect, an attempt on the part of Salem to use its police power to take Robertson's property without due process of law and without payment of just compensation for the taking, and therefore violative of the guarantees of the Constitutions of the United States and the State of Oregon, and, hence, void as to Robertson.

Counsel for the plaintiff is requested to submit proposed findings of fact, conclusions of law and decree in conformity with this opinion.