Argued May 19, affirmed July 6, 1960

DENNIS ET UX *v.* CITY OF OSWEGO ET AL

353 P. 2d 1044

*Leo Levenson* and *Norman B. Kobin,* Portland, argued the cause and filed briefs for appellants.

*L. Eugene Crampton,* Oswego, argued the cause for respondents. With him on the brief was Philip A. Levin, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

## SLOAN, J.

This case involves the validity of a zoning ordinance adopted by defendant city. The trial court sustained the ordinance and plantiffs appeal. Plaintiffs alleged that the city council acted in an unlawful, arbitrary and capricious manner to oppress plaintiffs when the city adopted the contested ordinance. Other issues are raised but the only real question is that presented by the allegations of arbitrary and capricious action. The ordinance rezoned a part of the commercial area of the city and eliminated automobile service stations as a permissive business within the "downtown" portion of the commercial area of Oswego.

The record reveals that Oswego was a community of about 5000 people. It appeared that something over 70 per cent of its employed residents worked in Portland. However, it was also a trading center of some import. One of plaintiffs' expert witnesses estimated that about 60,000 people were within the direct trading area of the city.

The downtown commercial area was substantially limited to two main streets that joined in a "T" formation. The top of the "T" was State Street, which also doubled as state highway 43 (old Pacific Highway). It was a four-lane street; two lanes of traffic moving in each direction. The street carried a heavy load of traffic. Plaintiffs' property fronted on this street.

Near plaintiffs' property the street was intersected by the Southern Pacific railroad. This created an additional and growing traffic problem.

The cross street joining was "A" Street. A substantial part of the retail trading shops and stores was located along these two streets. Prior to the enactment of the challenged ordinance service stations were permitted within the area primarily formed by the junction of the two streets described. There were about twelve existing service stations within the area restricted by the ordinance at the time the ordinance was enacted. These became nonconforming uses. The ordinance was considered and passed in April and May of 1957.

For some years prior to 1957 plaintiffs had been the owners of an unimproved lot within the questioned area. In 1956, plaintiffs expended considerable money in erecting a bulkhead along one boundary line of their property and in grading and filling the lot. Thereafter they negotiated with various business enterprises to find a suitable tenant for the lot. Mr. Dennis testified that the only prospect he could find that would be willing to pay enough to return plaintiffs' investment in the lot was one of the major oil companies. Plaintiffs entered into an option-lease agreement with the oil company. Word of plaintiffs' plan to cause a service station to be erected on their lot shortly became known to the community. Members of the city council learned of the plan. The council met and passed a resolution which set forth the intent of the council to consider adoption of the challenged ordinance and set a time for hearing and provided for notice of the hearing.

The ordinance was considered by the city planning commission, which recommended its adoption, and was

considered by the city council at three different meetings extending over a period of several weeks. Plaintiffs and representatives of the oil company were present at the council meetings and expressed their views without restriction or limitation.

We mention the fact that the ordinance was not considered until plaintiffs had formulated plans to erect a service station because that appears to be the only evidence which indicates any arbitrary action on the part of the city council. However, the uncontradicted testimony of the members of the city council and the planning commission reveals that the problems of eliminating service stations from the area had been considered for several years. Because there were already so many stations situate within the compartively small area involved, the officials involved thought it unlikely that other people would invest in additional stations. Plaintiffs' plan to do so admittedly sparked the council and planning commission into action.

The ordinance recited, and the responsible city officials testified, that the ordinance was passed to safeguard pedestrians on the sidewalks, to prevent traffic congestion, eliminate surface drainage of water across the sidewalks adjacent to service stations and to promote the orderly development of the area into a retail trading zone. The officials testified that the space occupied by service stations caused the retail area to be divided or separated thereby and that foot traffic was more hazardous and less convenient to the public.

The bulk of the record is consumed by expressions of opinion by expert witnesses called by plaintiff and the city officials. Some facts as to the vehicle traffic in the area and similar matters were also presented. There are enough facts in evidence to show that State

Street carried a daily traffic load of about 12,000 vehicles and the number was increasing year by year. It appears that during the hours of the heaviest traffic the street is carrying very close to its maximum capacity. There was conflicting opinion as to whether or not a service station added to traffic congestion.

There were also some conflicting opinions as to the hazard and inconvenience imposed on pedestrians by service stations in retail areas. It was significant that none of plaintiffs' expert witnesses had made any real investigation into the number of pedestrians who used the sidewalk in front of plaintiffs' property. There was testimony that a school was situate nearby and the sidewalk was used by school children. It was also significant, in regard to the pedestrian problem, that plaintiffs' experts conceded that in modern, planned shopping centers, such as Lloyd's etc., in Portland and other cities, the service stations were located on the fringe of the shopping area and not mingled in between retail stores. We do not mean to infer that city officials may exercise the same control over property as that employed by privately owned and developed shopping centers. The evidence is persuasive in that it confirms the opinion expressed by the city officials that filling stations create an inconvenience and potential hazard in a retail area devoted largely to pedestrian traffic.

It was admitted that service stations can create a surface drainage problem. The problem created is not only a nuisance to pedestrians, but frequently it appears difficult to provide adequate means and facilities to dispose of the surface water.

It was admitted by plaintiffs' experts that in more congested shopping areas, such as downtown Portland or Seattle, it was perfectly proper to eliminate service

stations. The plaintiffs' experts contended, however, that Oswego was too small and too uncongested to warrant the restriction.

Plaintiffs contend that a service station creates no more of a problem than any other form of a drive-in business, such as a grocery store or a drive-in hamburger stand. The trial court answered this argument in a few, but well chosen words: "It is true that it is possible to point to other businesses which are equally objectionable if you consider only one ground of objection at a time. * * * However, it would be difficult to find another business which would be equally objectionable on all the grounds specified."

■ The evidence presented in this case does not even raise a suspicion that the city council acted in an arbitrary or capricious manner. To the contrary, the record shows that the council did not agree with the arguments presented to it by representatives of the oil industry. The problem presented here is strictly one of opinion. We need not go beyond our own cases to know that a difference of opinion provides no basis for invalidating a zoning ordinance. *Shaffner et al v. City of Salem et al*, 1954, 201 Or 45, 268 P2d 599. "[The court] will not review it if the question is fairly debatable. [Citing authority]" 201 Or at p 51. *Jehovah's Witnesses v. Mullen et al*, 1958, 214 Or 281, 330 P2d 5; cert den 359 US 436. Speaking of the broad general power of a city in respect to zoning, Justice WARNER said:

"The term 'public * * * convenience', as found in Section 3, supra, of the ordinance, is not used in a colloquial manner as being synonymous with 'handy.' The word 'convenience' as there employed refers to what is fitting or suited to the public need. * * *

"The term 'public welfare' baffles attempt to give it precise definition because of its constantly expanding concepts. 'Sometimes it has been said to include public convenience, comfort, peace and order, prosperity, and similar concepts.' Opinion of the Justices of the Senate, 333 Mass 773, 128 NE2d 557, 561 (1955). The breadth of its inclusive character has been recently attested in *Berman v. Parker*, 348 US 26, 75 S Ct 98, 99 L Ed 27 (1954), where, at p 33, Mr. Justice Douglas says:

" '* * * The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc. v. Missouri*, 342 US 421, 424. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them * * *.' " 214 Or at pp 306-307.

The same cases repeat the accepted truths that the plaintiff must sustain the burden of proof to overcome the presumption of validity and that the burden is a heavy one. It is not sufficient to merely create doubt as to the ordinance. The council was presumed to have acted reasonably and we find nothing in the record to overcome that presumption.

Plaintiffs have cited innumerable cases and we have considered them. We will not prolong this opinion by discussion of these cases. It is only necessary to mention that automobile service stations have been the subject of uncounted cases. A fact, in itself, which persuades that they are a subject for individualized treatment. No case has been cited which holds to the contrary. It is true, of course, that there are cases

holding that certain restrictions imposed were unreasonable but, as stated, the authorities are clear that automobile service stations are a proper basis of classification. If one desires a resume of many of the cases on the subject see 2 Law of Zoning, Metzenbaum, ch X-m-3, p 1467 et seq., 1955.

We concur in the opinion given by the trial court and find no further enlargement thereon necessary.

Affirmed.