Argued October 2, 1964, affirmed March 10, 1965

# OREGON CITY *v.* HARTKE ET AL

400 P. 2d 255

*George L. Hibbard,* Oregon City, argued the cause for appellants. With him on the briefs were Hibbard, Jacobs, Caldwell & Kincart, Oregon City.

*Malcolm J. Montague,* Portland, argued the cause for respondent. With him on the brief were Alden E. Miller, City Attorney, Oregon City, and Williams, Montague, Stark & Thorpe, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

O'CONNELL, J.

Defendants appeal from a judgment of conviction for the violation of a city zoning ordinance.

Defendants operated a wrecking yard on a parcel of land within Oregon City under an ordinance which permitted the operation as a non-conforming use. Defendants extended their wrecking operation to contiguous land without obtaining municipal authorization to make a non-conforming use of this additional land. Defendants were convicted for making this latter use without authorization.

Defendants first contend that the zoning ordinance in question is invalid on the ground that it was not enacted in compliance with the requirements of the city charter.

Sections 29 and 30 of the Charter of Oregon City require certain procedures in the enactment of ordinances. The pertinent charter provisions are set out in the margin.[1] Plaintiff city could not produce the original written ordinance with the map describing the zones which must have been first read to the city commission and used as copy for the printer in publishing the ordinance in the newspaper as required by the charter. The only evidence of the ordinance of-

---

[1] "Sec. 29. All ordinances shall be read at two meetings of the commission. Immediately following the first reading of the proposed ordinance it shall be published in some newspaper in Oregon City. Should any change or amendment be made in any ordinance after publication of the same, as changed or amended, shall be published before final action is taken; Provided, that one full week shall intervene between last publication and final action. Whenever the commission proposes to take final action on any ordinance at a special meeting, notice thereof, giving the date of such meeting, shall be published or posted along with the ordinance.

"Sec. 30. Upon the passage of any ordinance the enrolled copy thereof shall be signed by the mayor and attested by the recorder, and thereupon, unless otherwise provided therein, such ordinance shall become a law and be in force and effect."

fered by plaintiff was the ordinance as it appeared on a newspaper sheet which was a part of the newspaper in which the ordinance had been published. The record shows that the mayor and city recorder signed and attested, respectively, the newspaper sheet setting out the ordinance and the map describing the zones.

■ It is defendants' position that the original writing or copy of the ordinance read at the commission meetings is the essential document and that unless that document is shown to have been read and enrolled the ordinance is invalid. We regard this as a hypertechnical interpretation of the ordinance. In the absence of evidence to the contrary, it is reasonable to assume that the ordinance as published was the same as the ordinance read at the meetings of the commission. The mayor and recorder treated the newspaper copy of the ordinance as the "enrolled copy" for the purpose of complying with Section 30 of the City Charter. We can see no reason why the published newspaper copy, if signed as an enrolled copy, should not be regarded as having the same quality as any other copy of the ordinance read to the commission. We hold that the procedure adopted in enacting the ordinance did not render the ordinance invalid.

Defendants next argue that plaintiff city, in enacting the ordinance, has exceeded the authority granted to it under ORS 227.220 and ORS 227.230. It is further argued that "on the facts of this case, the ordinance violates the Oregon Constitution in that it is an arbitrary and capricious use of the police power bearing no reasonable relationship to the public health, safety, morals or general welfare." We are not told what section of the Oregon Constitution is violated. Defendants interpret the zoning ordinances of plaintiff city as totally excluding the use of any property for

the business of wrecking cars unless permission for a non-conforming use is granted.

It would appear, however, that defendants attack the ordinance on three grounds: (1) that the exclusion of the automobile wrecking business from Zone M-1 was arbitrary and capricious in that such exclusion does not promote the health, safety, morals and general welfare of the community, i.e., the action was not within the police power; (2) that conceding for purposes of argument that an ordinance could constitutionally exclude such a business, the enabling statutes (ORS 227.220 and 227.230) do not authorize total exclusion, and (3) that the ordinance is unconstitutional because it wholly excludes a business the operation of which is lawful.

We shall first consider the contention that the exclusion of the car wrecking business from Zone M-1 (light industrial zone) was arbitrary and capricious. It is argued that no reasonable distinction can be made between the character of defendants' use and the character of the uses expressly permitted in Zone M-1.

■ Section 12 of the ordinance lists twenty-four uses which are permitted in Zone M-1 only if they are enclosed within a building. Defendants' activities would, for the most part, be conducted in an area not within a building. However, Section 12 also permits five described uses outside a building.[2] There is a rational basis for distinction between these permitted uses and a use for automobile wrecking purposes. The city commission may have felt that the operation of an automobile wrecking yard would produce more

---

[2] The outdoor uses permitted in Zone M-1 include yards for retail lumber, building materials, feed or fuel; draying, trucking and automobile freighting yards; contractors' equipment yards, and yards for the building and repair of small boats.

noise, smoke or fumes and would be more unsightly than the permitted uses. If there is any rational basis for the distinction, we must assume that the commission employed it in enacting the ordinance. Further, the commission may have felt that if auto wrecking yards were to be permitted at all, they should be located in Zone M-2, the heavy industrial zone.[9]

■ Considering next the enabling statutes, we are of the opinion that the city is empowered to wholly exclude a business from all zones if there is a rational basis for excluding it.

ORS 227.220 authorizes the city "to create or divide the city into districts within some of which it shall be lawful and within others of which it shall be unlawful to * * * carry on certain trades or callings." It is argued that this language indicates a legislative intent that a business is to be permitted to carry on its activities in at least one of the zones established by the city and cannot be excluded from all of the zones. We do not so construe the language.

We think that the legislature simply intended to indicate the general basis for classifying the zones and that the language was not intended to say one way or the other whether the city could wholly exclude a business from conducting its activities within the city. In this connection it will be noted that the statute states that only "*certain* trades or callings" are to be permitted in the city, which may suggest that the legislature intended the city to have authority to exclude other trades or callings if such action would serve the public interest.

■ ORS 227.230 is also relied upon as precluding

---

[9] While it is true that automobile wrecking was not included among the permissible uses in Zone M-2, the record does not show that this omission was intended.

the city from wholly excluding a business from the city. This section provides in part that "the council may by ordinance regulate, restrict and segregate the location of industries \* \* \*." It is argued that neither the word "regulate" nor the word "restrict" can be interpreted to mean "exclude." We disagree. Regulation or restriction, to be effective, may in some circumstances require the complete exclusion of an activity within the city.[④]

Finally, it is argued that if the ordinance is construed to exclude defendants' activity from Zone M-1, then defendants are wholly excluded from operating within the city (except for the permitted non-conformance) because none of the other zones set up by the ordinance permit the use of property for the automobile wrecking business. Total exclusion it is said, not only exceeds the limits of the powers delegated by statute, but also violates the Oregon Constitution, the exclusion not being justified as an exercise of the police power.[⑤]

The Oregon City ordinance does not list automobile wrecking yards as a permitted use within any of the zones. The ordinance authorizes the board of adjustment to permit additional specified uses. Auto wrecking is not specified as one of these additional

---

[④] The statute in question should be distinguished from those which enable towns to regulate and restrict one particular item, e.g., billboard advertising or the sale of liquor. Cases construing the latter type of statute as preventing total exclusion of the item cannot be controlling in the instant case where only one of many uses of land has been prohibited. By the same token, we would reject the reasoning of City of St. Louis v. Howard, 119 Mo 41, 46, 27 SW 770 (1893) insofar as it holds that a provision enabling the city to "provide for the \* \* \* regulation of slaughterhouses" empowers it to "prescribe rules whereby slaughterhouses may be \* \* \* checked or restrained either partially or in toto."

[⑤] Apparently defendants rely upon Article I, § 10 of the Oregon Constitution.

uses. The ordinance contains no other procedural machinery by which interested or aggrieved persons can seek relief from the exclusionary effect of the ordinance. It follows, then, that if defendants or anyone else wished to engage in the auto wrecking business in Oregon City it would be necessary to induce the city commission to amend the ordinance.

Defendants' contention raises three questions: (1) Do defendants have standing to attack the validity of the ordinance on the ground that automobile wrecking yards are totally excluded from the city; (2) assuming that there is standing and that total exclusion is unconstitutional, must defendants make an effort to have the ordinance amended before seeking judicial relief, and (3) does the city have the constitutional power to wholly exclude automobile wrecking yards from the city on the sole ground that they are aesthetically offensive?

■ Defendants own land in Zone M-1 but there is no evidence that they own land in Zone M-2 and we shall assume that they do not. We have held that the plaintiff city could lawfully exclude automobile wrecking from Zone M-1. It could be argued that inasmuch as we regard the exclusion of such a use from Zone M-1 as lawful the invalidity of the ordinance lies only in the exclusion of such uses from Zone M-2 (assuming total exclusion is unconstitutional), and since defendants have no land in Zone M-2 they lack standing to raise the question.© This assumes that if the city had known that total exclusion was unconstitutional, it would have permitted automobile wrecking yards in

---

© Urann v. Village of Hinsdale, 30 Ill2d 170, 195 NE2d 643 (1964); Jensen's, Inc. v. Town of Plainville, 146 Conn 311, 150 A2d 297 (1959). Cf., Brown v. City of Los Angeles, 183 Cal 783, 192 P 716 (1920).

Zone M-2 and not in Zone M-1. But an owner of land in either of these zones, desiring to contest the validity of the ordinance, would not know what choice the city would make under such circumstances. As long as the choice is not known we believe that it is only fair to permit an owner of land in either zone to contest the validity of the ordinance on the ground that it wholly excludes the intended use.[7] Under these circumstances Zones M-1 and M-2 may be regarded as an integral area of land within which the ordinance has prohibited the use sought to be made. We hold that defendants had standing to question the constitutionality of the ordinance on the ground that it wholly excludes automobile wrecking yards from Zones M-1 and M-2.

■ Ordinarily, those who seek judicial relief must show that they have exhausted their administrative remedies.[8] As we have previously noted, the Oregon City ordinance provides no administrative procedure by which defendants could have obtained relief from the exclusionary effect of the ordinance. They could have sought relief through a request to the city commission for an amendment of the ordinance permitting automobile wrecking yards in Zone M-2, if not in Zone M-1.

■ Must defendants make this latter effort before seeking judicial relief; in other words, must they exhaust their *legislative,* as well as their *administrative,* remedies? When the constitutionality of a statute is called in question courts do not insist that the aggrieved party first make an effort to amend the statute. The Oregon City zoning ordinance, although

---

[7] Cf., City of Watseka v. Blatt, 320 Ill App 191, 50 NE2d 589 (1943). But see Urann v. Village of Hinsdale, cited in note 6.
[8] 3 Davis, Administrative Law (1958 ed) § 20.01 et seq.

derivative in the sense that an enabling statute authorizes it, is the basic legislation establishing the various zones in Oregon City and setting up the procedure by which the ordinance is to be administered. In this respect the ordinance is comparable to a statute and it would appear, therefore, that the same rule permitting an attack on a statute without seeking legislative amendment should apply to an ordinance, unless there are other differences which call for separate rules. We recognize that there are differences. Usually fewer obstacles and complexities confront one who seeks to induce a change in an ordinance than one who attempts to change a statute. And perhaps it can be argued that zoning ordinances are intended to be more malleable than statutes in order to accommodate the demands for various changes, and thus it is expected that the citizen seek those changes at the legislative level before asking for judicial relief.

But even granting that there are these differences between a statute and a zoning ordinance, we think that defendants in the present case should be permitted to raise the question of the constitutionality of the ordinance. In the first place, the ordinance does not provide any procedure by which persons in the situation of the defendants can direct the attention of the city commission to a needed amendment. Section 22 of the ordinance makes provision for the initiation of an amendment by a petition signed by the owners of 60% of the property within the area of proposed change and within 300 feet of such area. The defendants' right to question the validity of the ordinance on constitutional grounds should not be conditioned upon obtaining the concurrence of neighboring owners who may not have any interest in raising the question. Moreover, when an ordinance enumerates

specific permitted uses and then carefully prescribes the procedure for obtaining relief from the strictures of the ordinance through administrative and legislative action, an aggrieved person might well read the ordinance as foreclosing any other legislative remedy or at least as not requiring the pursuit of a legislative remedy as a condition precedent to judicial relief.

Whatever legislative remedy defendants may have sought, the fact is defendants are now before us and have raised a constitutional question which is within our power to decide. Although we could refuse to decide the question and await the day when, if ever, they are denied a permit to operate an additional wrecking yard within Oregon City, we believe that it is more practicable to now dispose of the question.⑨ That question is whether a city can wholly exclude a use of property on the sole ground that the use is offensive to aesthetic sensibilities.

■ The cases generally hold that zoning for aesthetic purposes alone is not a valid exercise of the police power. Land use restrictions designed solely for the improvement of the appearance of the community do not, it is felt, tend to promote the public health, safety, morals or the general welfare of the community.

However, there is a growing judicial recognition

⑨ There is some authority taking a different view. In Illinois, where an ordinance outlines procedures for the initiation of an amendment, the court will apparently require this remedy to be exhausted before an aggrieved party may initiate an action to determine the constitutionality of the ordinance as applied to his property. But the requirement of exhaustion does not exist where the aggrieved party is the defendant in proceedings instituted by the governmental unit. Brader v. City of Chicago, 26 Ill2d 152, 185 NE2d 848 (1962). In Utah, however, even a defendant in criminal proceedings has been held to a requirement of exhaustion of legislative remedies. Provo City v. Claudin, 91 Utah 60, 63 P2d 570 (1936).

of the power of a city to impose zoning restrictions which can be justified solely upon the ground that they will tend to prevent or minimize discordant and unsightly surroundings. This change in attitude is a reflection of the refinement of our tastes and the growing appreciation of cultural values in a maturing society. The change may be ascribed more directly to the judicial expansion of the police power to include within the concept of "general welfare" the enhancement of the citizen's cultural life. The broadening of the police power in this respect follows the expansion of the police power in other areas of regulation, as the state courts, influenced by *Nebbia v. New York,* 291 US 502, 54 SC 505, 78 L Ed 940, 89 ALR 1469 (1934), have exercised greater judicial restraint in passing upon the validity of legislative control of economic interests.[10]

The idea that the general welfare embraces aesthetic values was recognized in *Berman v. Parker,* 348 US 26, 75 S Ct 98, 99 L Ed 27 (1954), where it was said:

"* * * The concept of the public welfare is broad and inclusive. See Day-Brite Lighting, Inc. v. Missouri, 342 US 421, 424. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the

---

[10] See, City of Phoenix v. Fehlner, 90 Ariz 13, 363 P2d 607, 609 (1961):

"The problem of what constitutes an appropriate zone is primarily for the legislature. It is not the prerogative of the courts to substitute their judgment for that of the body which our system of government vests with primary responsibility for determining how best to serve public health, safety and welfare. The only role which the courts can properly play in the decision making once the properly constituted legislative body has spoken is to insure that the legislature has not exceeded the broad bounds set by the constitutions of the State and of the United States."

legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them * * *."

Although the foregoing statement was made in a case involving the condemnation of property under eminent domain, we have recognized its applicability to the zoning power.[⊕]

■ It must be conceded that authority for the validity of zoning for aesthetic purposes only is scant. *People v. Stover,* 12 NY2d 462, 240 NYS2d 734, 191 NE2d 272 (1963) is most directly in point with the instant case. In that case it was held that an ordinance prohibiting the maintenance of clotheslines in front or side yards abutting a city street was sustainable as a proper exercise of the police power. After observing that aesthetic considerations, together with other reasons for restricting the use of land, had been recognized in zoning cases the court said:

"Once it be conceded that aesthetics is a valid subject of legislative concern, the conclusion seems inescapable that reasonable legislation designed to promote that end is a valid and permissible exercise of the police power. If zoning restrictions 'which implement a policy of neighborhood amenity'

---

[⊕] Jehovah's Witnesses v. Mullen et al, 214 Or 281, 306-07, 330 P2d 5, 74 ALR2d 347 (1958). In City of Phoenix v. Fehlner, supra 363 P2d at 610, the court said:

"While the Supreme Court in the Berman case was dealing with the Due Process Clause of the Fifth Amendment which restricts federal action we think for the purposes here under consideration that the Due Process Clause of the Fourteenth Amendment is no more restrictive of state action when exercising its police power to promote the general welfare. See State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217."

are to be stricken as invalid, it should be, one commentator has said, not because they seek to promote 'aesthetic objectives' but solely because the restrictions constitute 'unreasonable devices of implementing community policy.' (Dukeminier, Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp. Prob. 218, 231.) Consequently, whether such a statute or ordinance should be voided should depend upon whether the restriction was 'an arbitrary and irrational method of achieving an attractive, efficently functioning, prosperous community—and not upon whether the objectives were primarily aesthetic.' (Dukeminier, loc. cit.) And, indeed, this view finds support in an ever-increasing number of cases from other jurisdictions which recognize that aesthetic considerations alone may warrant an exercise of the police power." (Citing cases). 191 NE2d at 275.

We join in the view "that aesthetic considerations alone may warrant an exercise of the police power."

However, *People v. Stover* is distinguishable from the case at bar on the ground that it did not involve a total exclusion of a particular use; the property owner was free to maintain clotheslines in his back yard and there was an express provision in the ordinance for the issuance of a permit for clotheslines in front and side yards in case of unnecessary hardship or practical difficulty in drying clothes elsewhere on the premises. In the case at bar we must test the constitutionality of the ordinance on the assumption that plaintiff city has wholly excluded automobile wrecking yards from the city without providing any procedure for obtaining a permit in case of hardship.

We hold that it is within the police power of the city wholly to exclude a particular use if there is a rational basis for the exclusion. The city commission has the responsibility for the planning and develop-

ment of the city in a manner which meets the needs of the community. The commission may interpret those needs as including the elimination of uses which are not in keeping with the character of the city as it then exists or as the community would desire it to be in the future.[®] It is not irrational for those who must live in a community from day to day to plan their physical surroundings in such a way that unsightliness is minimized. The prevention of unsightliness by wholly precluding a particular use within the city may inhibit the economic growth of the city or frustrate the desire of someone who wishes to make the proscribed use, but the inhabitants of the city have the right to forego the economic gain and the person whose business plans are frustrated is not entitled to have his interest weighed more heavily than the predominant interest of others in the community.

We hold that the ordinance wholly excluding automobile wrecking yards from Oregon City is a valid exercise of the police power.

The judgment is affirmed.

ROSSMAN, J., did not participate in the decision of this case.

[®] For a fuller understanding of the reasons supporting our conclusion, see the following writings: Comment—Zoning, Aesthetics, And the First Amendment, 64 Colum L Rev 81 (1964); Dukeminier, Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp Prob 218 (1955); Rodda, The Accomplishment of Aesthetic Purposes under the Police Power, 27 So Calif L Rev 149 (1954); Baker, Aesthetic Zoning Regulations, 25 Mich L Rev 124 (1926); Chandler, The Attitude of the Law Toward Beauty, 8 A B A J 470 (1922).