Argued November 15, reversed December 11, 1968, petition for
rehearing denied January 21, 1969

PERKINS ET AL, *Appellants, v.* MARION
COUNTY ET AL, *Respondents.*

448 P. 2d 374

314

*M. Chapin Milbank,* Salem, argued the cause for appellants. On the briefs were Brown, Schlegel, Bennett & Milbank, Salem.

*Robert DeArmond,* Salem, argued the cause for respondents. On the brief were DeArmond, Sherman & Barber, and Gary D. Gortmaker, District Attorney, Salem.

Before SLOAN, Presiding Justice, and O'CONNELL, GOODWIN, HOLMAN and LANGTRY, Justices.

LANGTRY, J. (Pro Tempore).

This appeal is from judgment of the circuit court which upheld, after trial, the action of the Marion County Board of Commissioners in allowing a zone change.

On December 1, 1958, the Marion County Court, pursuant to ORS ch 215, adopted Ordinance No. 2 which provided for interim zoning in the "south area" (designated as Zone Area No. 2) of the metropolitan area surrounding the city of Salem. This interim zoning was made permanent by Ordinance No. 24, adopted February 3, 1960. Testimony and zoning maps in evidence make it appear that this area was later included in Zone Area No. 7 under Ordinance No. 83, adopted on March 11, 1964, but the latter ordinance is not in the record. The parties have treated Ordinance No. 24 as containing the effective zoning provisions involved here and this court will do likewise.

Sixteen types of districts were designated in the zoning ordinance. One is the RA Suburban District

and the two least restrictive districts are M-1 Light Industrial and M-2 Heavy Industrial.

All types of residential uses are allowed under RA as well as such uses as parks, playgrounds, golf courses, hospitals, schools, churches, public buildings, and agricultural pursuits.

The M-1 Light Industrial definition allows many uses, among which is:

"31. Sand and gravel plant, provided no pit is excavated in connection therewith * * *." Section 13.01.

The M-2 Heavy Industrial definition allows any lawful use except, among others:

"6. Gravel pits; quarries * * *." Section 14.01.

On November 15, 1965, the defendent M-P Materials Corporation petitioned the Marion County Planning Commission to change the zone on property it had recently purchased from Albert and Leonard Schindler in the Minto Island area which was included in the above described zoning ordinance. It asked for a change from RA Suburban zone to M-1 Light Industrial (48 acres), and M-2 Heavy Industrial (7½ acres). This property was described as lying generally to the north of the Salem Golf Club property, and the proposed M-2 area was inside the M-1 area. It appears that five Schindler brothers once jointly owned a large part of Minto Island. Before zoning was enacted Albert and Leonard Schindler separated their partnership from the others and together took the part in question. The other three retained the balance.

The minutes of the first hearing before the planning commission on December 1, 1965, state:

"* * * It was established that: (1) That the

property has previously been used for a gravel operation and is now also * * *."

This hearing was continued to December 15, 1965. The Land Use Committee Report then before that commission contains the following:

"6. FINDINGS OF FACT AND CONCLUSIONS, BASED UPON PUBLIC HEARING AND STAFF REPORT: The Committee finds the facts as set forth and referred to in Item (5) to exist. The Committee has viewed the site of the proposed zone changes. During this tour, *the Committee noted that there has not been any excavation for gravel from any portion of these parcels and the developers have indicated that they do not intend to use this site for a gravel quarry.* The relationship of this site to those to the west now in use as quarries, makes the proposed zone change a logical request. (Emphasis supplied.)

"7. BASED UPON FINDINGS OF FACT AND CONCLUSIONS RECITED, IT IS RECOMMENDED THAT THE ZONE CHANGE BE *GRANTED.*"

The proposed change was approved by the planning commission and forwarded to the Marion County Board of Commissioners which, after hearing, enacted Ordinance No. 108, dated January 31, 1966, changing the proposed areas to M-1 and M-2. This ordinance was upheld by the circuit court and is the subject of this appeal.

At the Board of County Commissioners' hearing protests by neighbors were made and a petition bearing about 500 signatures of protestors was filed. Throughout the proceedings, with exceptions already noted, the record indicates an intent by petitioners to use the site for a gravel quarry, rock crushing and asphalt paving plant. Considerable evidence in the

record indicates that little, if any, gravel quarrying has been carried on on Minto Island, but it has been extensive and continuous on Browns Island across a slough to the southwest. After Ordinance No. 108 was adopted, the plaintiffs brought this declaratory judgment suit seeking to have the ordinance declared invalid. The plaintiffs own property near the area of the proposed change. Some of the plaintiffs' property adjoins the area; some of it is as far as three-fourths of a mile away. There is no question of compliance with notice requirements or of jurisdiction, although one of plaintiffs' original objections was based on lack of notice.

Minto Island was once truly an island, but is now a peninsula pointing northward in the bottom land of the Willamette River. It is an unincorporated area, roughly three sides of which are bounded by water, through which water runs the Salem city boundary. The northerly end of the peninsula was zoned industrial in the original comprehensive plan. It lies between industrial areas of Salem on each side of the Willamette River. The southerly balance of Minto Island in the RA zone, according to the scale on maps in evidence, appears to be somewhat over a mile in length and about 3200 feet in average width. It contains the land in question, other land of like character, and the Salem Golf Club. The entire area is subject to flooding and thus unsuited to residential purposes. Aside from the golf course the principal use, according to the evidence, has been agricultural. A slough on the easterly side of Minto Island until recent years was used for log storage, and in other areas refuse land fill and burning operations were carried on, but they also have ceased. The M-1 and M-2 areas granted by Ordinance No. 108 project well out into the RA zoned

area. The southerly edge of the M-1 area is separated by a narrow buffer zone from the Salem Golf Club and abuts a slough which separates Minto Island from Browns Island to the southwest, which, as previously noted, has been the scene of extensive gravel quarrying and processing. The heavy preponderance of the evidence and the planning commission's committee report quoted above indicate gravel quarrying operations have existed hardly at all, if any, on Minto Island during the zoning period.

The zoning ordinance does not allow the opening of a gravel pit, even in M-2 areas. Apparently defendants believe that the taking of gravel from the property is a nonconforming use which predates zoning and that consequently they need permission only for the manufacturing of the rock and the asphalt paving products.

Whether the evidence indicates an interruption or abandonment of any such nonconforming use, which, if it once existed would preclude a resumption, is not a question presented to this court. ORS 215.130(5) provides:

"* * * [S]uch nonconforming uses shall not be increased, changed or resumed after a period of interruption or abandonment * * *."

See discussion in *Bither v. Baker Rock Crushing*, 249 Or 640, 438 P2d 988, modified in 249 Or 640 at 653, 440 P2d 368 (1968).

"Consideration by a court generally is confined to errors or grounds properly noted and assigned for review. Moreover, the general rule is that a court considers only questions that were before the board. Neither new issues nor evidence relative thereto are to be considered on judicial review of

the zoning board's decision. The theory of the case upon the review is the theory adopted and pursued below * * *." 8A McQuillin on Municipal Corporations 447-8, § 25.334 (3rd ed 1965).

Neighbors near the subject property who protested and testified were concerned with aesthetic considerations, but they also expressed concern about value losses to crops and other property by reason of the anticipated dust and smoke.

Property owners from farther away, on high ground one-half to three-fourths of a mile easterly, were concerned that the pleasantness of the rural farming view would deteriorate. One testified this alone would lower the value of his property by several thousand dollars. ORS 215.055, which sets standards for this zoning, includes consideration of the "public need for healthful, safe, aesthetic surroundings and conditions."

In *Oregon City v. Hartke*, 240 Or 35, 49-50, 400 P2d 255 (1965), Mr. Justice O'CONNELL wrote:

"We hold that it is within the police power of the city wholly to exclude a particular use if there is a rational basis for the exclusion. The city commission has the responsibility for the planning and development of the city in a manner which meets the needs of the community. The commission may interpret those needs as including the elimination of uses which are not in keeping with the character of the city as it then exists or as the community would desire it to be in the future. It is not irrational for those who must live in a community from day to day to plan their physical surroundings in such a way that unsightliness is minimized. The prevention of unsightliness by wholly precluding a particular use within the city may inhibit the economic growth of the city or frustrate the desire of someone who wishes to make

the proscribed use, but the inhabitants of the city have the right to forego the economic gain and the person whose business plans are frustrated is not entitled to have his interest weighed more heavily than the predominant interest of others in the community."

*Hartke* approved the exclusion of a business. Here, the county commissioners are allowing one where the comprehensive plan they previously had adopted excluded it. The reasoning of *Hartke* is applicable.

██ The presumption is that the ordinance is valid and the commissioners acted reasonably. A mere difference of opinion as to what is reasonable under the circumstances will not suffice to carry the plaintiffs' burden of proof. *Dennis et ux v. City of Oswego et al,* 223 Or 60, 353 P2d 1044 (1960) ; *Shaffner et al v. City of Salem et al,* 201 Or 45, 268 P2d 599 (1954).

█ It was held in *Page et ux v. City of Portland et al,* 178 Or 632, 639-640, 165 P2d 280 (1946), that as a general rule "spot zoning" is invalid, but the decision in each case depends upon its particular facts.

"While the City Council has wide discretion in enacting zoning ordinances, it has no right or authority to place restrictions on one person's property and by mere favor remove such restrictions from another's property. There must be reasonable ground or basis for the discrimination. * * * Whether there has been such a substantial change of conditions in a use district as to warrant the enactment of an amendatory zoning ordinance is primarily a question for the Council to determine, and its actions, in reference thereto, will not be reviewed by the courts if the question is fairly debatable. It is only when the legislation is clearly arbitrary and unreasonable that a court will interfere * * *."

■■ In examining the reasonableness of the legislative decision, the court will evaluate the evidence in the record. One inquiry is how the affected community reacted to the proposed change. *Shaffner et al v. City of Salem et al,* supra, at 52. Here, a petition of protest bore some 500 signatures. The county commissioners noted that some of these protestors lived or owned land a considerable distance away from the subject land. Nevertheless, it is obvious that many people living nearby considered themselves and their property sufficiently offended to protest. All of them had a legitimate interest when they protested the breakdown of the existing comprehensive plan. Several neighbors appeared to testify and protest against, and only one testified favorably to the proposal.

In the substantial area involved on Minto Island the evidence indicates, as already noted, that from the time of the first interim zoning ordinance in 1958 the trend has been away from the relatively minor industrial use then in existence. In fact, the inference is reasonable that it had completely ceased. Allowance of these industrial uses would invade a large spot in this rural area and reverse the trend. Not only that, it would be the opening wedge and an invitation for a continuation of the same sort of change. The preliminary comprehensive plan of the Mid-Willamette Valley Planning Council, which is authorized under ORS 190.010, and projects long-range planning for the area, had, in maps widely publicized in January 1963, designated this area for "large parks." Charles Gale, Regional Parks Director, testified before the commissioners that "* * * this proposal has far-reaching implications in the acquisition of park lands and the preservation of open-space along the Salem

area's most valuable natural asset, the Willamette River."

A zoning ordinance "which singles out a parcel of land within the limits of a use district and marks it off into a separate district for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain." 1 Rathkopf, The Law of Zoning & Planning 26-3 (3rd ed 1966), quoting from *Cassel v. Mayor and City Council of Baltimore,* 195 Md 348, 73 A2d 486 (1950).

At the county commissioners' hearing counsel asserted the defendants have a very heavy investment in the property (there was no testimony or other evidence in this regard); that Albert and Leonard Schindler recently sold it for $1,000 per acre for the petitioned use; and that petitioners should not be denied a chance to get their investment back rather than hold the property indefinitely. Counsel stated that the property is heavily taxed. Against this, Mr. Turfield Schindler, called as a witness by the plaintiffs, stated that he and his brothers have long farmed land on Minto Island adjoining that in question, and that in the year in which he was testifying, on a 25 to 28-acre cherry orchard planted in 1950 they made a profit of approximately $1,000 per acre. Evidence indicates that Minto Island is composed of excellent surface soil and is intensively cultivated—mostly in row crops.

In the quotation from *Page v. Portland,* supra, it is noted that a major consideration of the legislative body and obviously of the court on review, is whether the evidence shows that there has been a substantial change in a use district warranting a change in the

ordinance. See also 1 Rathkopf 26-14. The evidence indicates that the only substantial change on Minto Island was away from industrial use, not toward it. Adjoining land owners almost universally opposed the change. There was no substantial evidence, as distinguished from argument, of hardship on the petitioners, and there was substantial evidence of a detriment to the public good. Evidence indicates that there are other adequate sources of rock in the area. Under the zoning ordinance if the area is reclassified M-1 and M-2 it will be eligible for any and all applicable light and heavy industrial uses. Among the tests of whether the change is valid is whether "* * * the legislative body apparently considered only the specific use proposed to be made of the property and gave little or no consideration to *all* of the uses permitted as a matter of right in the less restricted district into which the property was reclassified." 1 Rathkopf, supra, 26-8-10. Here, the record indicates the county commissioners did not give adequate consideration, if any, to such other permissible uses. We conclude that plaintiffs are correct in their contention that there was insufficient evidence to justify the change, and that the change constitutes invalid "spot zoning."

"* * * While it is the law in this state that in a legislative context a mere difference of judgment or opinion concerning esthetics or public interest is not subject to judicial review, *Dennis et ux v. City of Oswego et al,* 223 Or 60, 65, 353 P2d 1044 (1960), it is clear that the courts have a duty to grant relief at the suit of a party aggrieved by arbitrary or capricious changes in neighborhood zoning. The dividing line between what is a mere difference of opinion and what is arbitrary is the line between zoning based upon objective factual evidence and zoning without a rational basis. See Linde, *Public Law,* 40 Or L Rev 249, 265." *Smith v.*

*County of Washington,* 241 Or 380, 386-87, 406 P2d 545 (1965).

The decree of the circuit court is reversed. Ordinance No. 108 is declared invalid, and an injunction consistent with the prayer of the complaint and this opinion is granted.