Argued December 1, 1971, reversed and remanded January 28,
petition for rehearing denied February 23, petition for
review pending

# FRANKLAND ET AL, *Appellants, v.* CITY OF LAKE OSWEGO ET AL, *Respondents.*

493 P2d 163

*David P. Templeton,* Portland, argued the cause for appellants. With him on the briefs were Dusenbery, Martin, Bischoff & Templeton, and Charles Robinowitz, Portland.

*Garry P. McMurry,* Portland, argued the cause for respondents City of Lake Oswego and John C. Mac-Lean, H. J. Fergusen, William Cook, Robert Dent, Mary Goodall, William Knowles, and Charles Needham. With him on the brief were McMurry, Sherry, Nichols & Cox, Portland.

*Gerson F. Goldsmith,* Portland, argued the cause for respondent Mountain Park Corporation. With him on the brief were Goldsmith, Siegel & Engel, and Brad Littlefield, Portland.

Also on the brief were Kenneth W. Baines, and Wheelock, Richardson, Niehaus, Baines & Murphy, Portland, for respondent Dave Christensen Inc., and David J. Krieger, and Black, Kendall, Tremain, Booth & Higgins, Portland, for respondent Security Bank of Oregon.

Before Langtry, Presiding Judge, and Foley and Thornton, Judges.

LANGTRY, J.

This appeal is from a decree which dismissed with prejudice the plaintiffs' suit for declaratory judgment, injunction, and, alternatively, damages. The motion to dismiss came at the conclusion of plaintiffs' case. Defendants sought to reserve the right to put on a case and there was a colloquy between court and counsel on this subject, but no decision.

Evidence or stipulations show all of the plaintiffs are property owners—principally home owners—who

assert their rights under zoning ordinances were infringed by the concerted action of the defendants in bringing about a change in the residential zone of an adjacent tract of land[1] to one which allowed construction of a four and five-story apartment building.

In 1967 various entities in which Carl Halvorson had a dominant interest acquired the right to purchase the property designated (B) and (C) in the accompanying maps (hereinafter the Kerr property). The segment of the Kerr property around which this suit revolves is in Multnomah County and lies immediately north of the east-west Clackamas-Multnomah County line and is designated (B) on the maps. It is separated by a dotted line from the balance of the Kerr property (marked (C)) on the accompanying maps. This land was undeveloped. Plaintiffs live or own property on the strip of land immediately west of (B), extending southward from Stephenson Street; this area is designated (A) on the maps (hereinafter called Arrowood). Arrowood was substantially developed with single family residences. Immediately east of (B) is other land, not involved here, which also was developed with single family residences.

Prior to the events which led to this litigation all of the land mentioned above which lay in Multnomah County had been zoned under a comprehensive plan as R-20—single family residential—upon which residences could be built only if the lot occupied an area of 20,000 square feet or more.[2] Arrowood had been

[1] The trial court held plaintiff Allman, a resident of Lake Oswego who lived some four miles from the apartment building, had no standing to challenge the zoning ordinance at issue in this case, although she could challenge the annexation ordinance (explained *infra*). Plaintiffs do not assign this holding as error.

[2] The area requirement was made because sewers were not available and septic tank sewage disposal required a fairly large area.

annexed to the City of Portland several years earlier, and remained zoned by Portland for single family residences. The accompanying maps illustrate that Arro-

wood is surrounded by the Kerr property except for its northerly tip. Conversely, the strip of land in controversy, (B), is surrounded by and a part of land which already had been comprehensively zoned single family residential, except for its southerly tip.

When Carl Halvorson acquired the right to purchase the Kerr property in 1967, he embarked upon a plan for developing the approximate 600 acres into what is termed a "Planned-Unit Development" (hereinafter called PUD). This development includes a town center, commercial area, park, equestrian and other recreational facilities, and areas for "garden"[9] apartments, town houses, duplexes, single family dwellings, etc. Defendant Mountain Park Corporation, of which Mr. Halvorson was the dominant owner, took title to the land and began the development. In order to obtain water supply and a sewer system, as well as other city services, negotiations were carried on with various municipal corporations. Mountain Park concluded that the best opportunity for development conforming to its own plans lay with the City of Lake Oswego (hereinafter called City). City, which was comprehensively zoned under a zoning code, passed an enabling ordinance permitting planned-unit development in new areas. Negotiations ripened into a contract between City, Mountain Park, and Sylvania Properties, another of the entities dominated by Mr. Halvorson. The contract contemplated City would annex the PUD in phases. A section of the contract dealt with annexation and development. Its tenor is that City agreed to accept the PUD zoning submitted by Mountain Park under its planned-unit development ordinance (except

---

[9] The definition of this term is a basis for controversy in this suit.

for changes or amendments agreed upon by the City of Lake Oswego Planning Commission and Mountain Park) in return for annexation.[4]

As contemplated by the contract, Mountain Park proposed annexation of Phases I, II and III of the PUD and City annexed these areas; later it annexed Phase IV which included the controversial strip (B). Shortly thereafter, it changed the zoning of Phase IV to allow, among other things, the building of "garden" apartments in the southerly part of strip (B) in accordance with the PUD plan submitted by Mountain Park. The procedure of annexation and zoning had to be redone because of a defect in the first annexation attempt.

Shortly after the rezoning, Mountain Park deeded 3.5 acres in the southerly part of Phase IV, (B), to defendant Dave Christensen Inc. The latter obtained a commitment for financing from defendant Security Bank of Oregon, and submitted to Mountain Park (pur-

---

[4] The contract provides the "Property Owners" (Mountain Park and Sylvania Properties) are to file annexation petitions for the successive phases, conditioned on the City's approval of the PUD plan for the particular phase, and that:

"In the event the City does not approve the Planned-Unit Development plan upon the property in question * * * the Property Owner shall be free to annex said successive development to any other jurisdiction it chooses * * *."

Plaintiff asserts this section contractually bound the City, upon accepting a petition for annexation of any phase, to accept the PUD zoning proposed by the Property Owner. The terms of the contract do not appear to support that contention. The condition of annexation calls for approval of the PUD plan, not rezoning in accordance therewith. We see nothing which would legally bind the City to enact zoning consonant with its prior approval, after the land is annexed. What right the Property Owner would have to withdraw (de-annex) the area is open to question. See ORS 222.524 and 222.111. Our decision in this appeal renders unnecessary a determination whether the City, by approving the proposed PUD plan, intended to or did bind itself to the PUD plan when it annexed the area in question.

suant to a contract) suggested sketches for an apartment building or buildings which Christensen proposed to construct thereon. After Mountain Park rejected several proposals it approved the plan effected for the apartment building in question. It was contemplated that another companion apartment building of roughly the same design, bulk and height, would be built close by if the first one rented well. The final approved plan contemplated some 230 apartment units in the area.

Plaintiffs testified that they learned for the first time the real bulk, size and nature of the proposed building when Christensen's bulldozers arrived and stripped the area of trees and other vegetation and put in a fill 27 feet high toward the south end of strip (B). They protested, obtaining a hearing before the city council on October 21, 1969. The council referred the matter to the Planning Commission to determine whether the proposed structure was a "garden" apartment in compliance with the PUD zoning ordinance. The Planning Commission ruled it was.[9] City issued a

***

[9] Mr. Rhode, who at that time was Chairman of the Lake Oswego Planning Commission, and is a consulting engineer, testified as follows:

"THE COURT: At the time you passed the first ordinance [for approval of the particular land use] had you ever been submitted any drawings by Christensen or any one as to what the Christensen development was to be up in Phase IV?

"WITNESS: No, we had not."

In this connection the Planned-Unit Development ordinance (in evidence) which had been passed by the City of Lake Oswego, requires:

"In planned-unit developments containing more than twenty-five acres the developer shall submit architectural sketches as required above for each phase of development containing less than twenty-five acres *before the time such phase begins*

temporary building permit. Thereafter, on November 20, after having previously warned in writing of such intention, plaintiffs brought this suit. On November 21, City issued a final building permit.

Christensen proceeded with the construction of the building, which was virtually completed at the time of trial. Its dimensions are 75 feet by 375 feet, and pictures show five stories on the southerly end, the first of which projects from the land fill, and four on the northerly end. It contains 80 rental apartments and occupies an area on the strip of land illustrated by the following sketch, which also shows Arrowood, (A), and the approximate locations of plaintiffs' houses. The scale of the apartment building is the same as the scale of the sketch, but we are not sure, from the evidence, whether it is positioned correctly on the sketch. This is the position which a witness drew into a map exhibit for it, but the contours on the map from which our sketch was taken make it seem probable that the building faces more directly easterly, rather than southeasterly.

Several plaintiffs had viewed the plans for the PUD which had been given publicity during the plan-

---

*actual construction.* For a planned-unit development or phase thereof in excess of twenty-five acres the developer shall submit architectural sketches depicting the types of buildings (single family, duplex, multi-family, commercial, etc.) and their prospective locations in the development showing their general height and bulk in relationship to the other improvements in the development and upon adjacent land. (Ord. No. 1172, Sec. 1 (132); 8-1-67.)" (Emphasis supplied.)

We interpret the testimony to mean that Christensen started construction by stripping the land and preparing the foundations before he or Mountain Park complied with this section of the ordinance.

ning stages and were aware that "garden" apartments were proposed.[⊛]

There was extensive testimony from plaintiffs about what they had believed about the type of apartment buildings which Mountain Park proposed. We quote some of the testimony of Mrs. J. Brumley, who was, with her husband, one of the plaintiffs.

"We have followed this very closely from the very beginning and we had always seen that there were garden apartments and I thought that garden apartments were one level * * *. And then we looked at models, little white models that were used to depict garden apartments were the same size as the houses on Arrowood and they were scattered around through the woods. * * * I talked to Mr. Nelson on several occasions. [Mr. Nelson was the on-the-site manager and Executive Vice-President for Mountain Park. He explained the project at at least one public meeting of interested persons which was held at nearby Jackson High School.] * * * [W]e had been told that nothing would be higher than two stories. * * * [E]ven * * * their hospital, is only two story and even their commercial is only two story and any model we saw * * * with the exception of one high rise * * * that would be behind us up on the crest of the mountain. * * * We were in the town houses when they first built them. We have been in every model and espe-

---

[⊛] Plaintiffs had never been personally notified by City or Mountain Park of the proposed zone change in the area. The PUD enabling ordinance City had adopted required only newspaper publication, which was accomplished. All other zoning ordinances in evidence and the testimony of zoning experts indicates the requirement of only published notification is uncommon. Most ordinances, including Lake Oswego's general zoning code, require personal notice to adjacent property owners before a zone can be changed. However, it appears that notice by publication fulfills due process requirements. See Annotation, Zoning Ordinances—Notice Requirements, 96 ALR2d 449, 459 (1964).

cially wanted to see the town houses when they were completed because we were told that they would put town houses next to us * * *."

Various of the exhibits in evidence which were used for publicity purposes as the PUD developed indicated that 280 "garden" apartment units would be included in the southerly half of the finger of property, (B), in controversy. The model and other similar sketches and maps indicated that the "garden" apartment build-

ings would be of the relative size of the small white blocks which can be seen on the first sketch above.[7]

The plaintiffs testified that the apartment building was incompatible with and destroyed the character of their neighborhood; that it had substantially depreciated the value of their properties because of the intrusion of the lights from the apartment building, and the lights and fumes from its parking lot, which was located behind and westerly of the apartment house and adjacent to their properties; that it invaded their privacy because, as one plaintiff put it, people could look from 120 windows into their living space; that it changed the population from permanent to temporary, and sharply increased its density. Mr. Lloyd T. Keefe, Planning Director for the City of Portland Planning Commission, described the apartment building as a "bull in a china shop."[8] Destruction of the

---

[7] Defendants argue the models and renderings exhibited at public hearings and before the city Planning Commission were merely conceptual illustrations of the structures generally contemplated within the development. The original plans gave a figure of 280 "garden" apartments for Phase IV. A later program submitted to City by Mountain Park for this area called for 246 "garden" apartments on two sites. The unit size was to vary from 900 square feet to 1500 square feet. Our arithmetic indicates three buildings approximating the size of the one constructed, 75 feet by 375 feet (28,125 square feet of ground space without the black-topped parking lot adjacent to plaintiffs' property) and four to five stories high, would be necessary to accommodate the number of apartments contemplated by this plan. (The final figure called for 230 "garden" apartments.)

[8] Besides offering the testimony of Mr. Keefe as an expert, the plaintiffs offered the testimony of Mr. Baldwin, who was then Planning Director for Multnomah County. The trial court sustained objections to testimony of this witness to the effect that a Planned-Unit Development should be compatible with adjacent property; that the apartment house was not compatible with the adjacent property or the PUD itself. Under the equity rule allowing such testimony although objection had been sustained, he testified: "I don't think there is another building like that in the entire development." His testimony was relevant

view from plaintiffs' properties was a major complaint about which they testified. Most of them had a view of Mt. Hood and other mountains which was substantially impaired or destroyed.

 Several assignments of error have been made by plaintiffs in challenging the trial court's dismissal. Some of them need not be discussed in view of our decision. The principal one, and the one upon which we rest our decision, is that the court erred in granting defendants' motion to dismiss on the grounds plaintiffs failed to prove City acted arbitrarily in enacting the ordinance which zoned the land in strip (B) for "garden" apartments. The trial court held plaintiffs had the burden of proof on this issue. In coming to that conclusion it viewed the PUD as a comprehensive plan in itself—one which, in pertinent part, superseded the preexisting comprehensive plan in the area adjacent to plaintiffs' property. To prove the ordinance invalid, the court held, plaintiffs had to prove the PUD comprehensive zoning plan was invalid in its entirety, rather than just in the area adjacent to plaintiffs' property (the southern part of strip (B) in Phase IV). We do not so interpret the law.

Years before, Multnomah County had included that part of Phase IV in a comprehensive plan, zoning it

---

and it was error not to receive and consider it, particularly in view of the fact that the prospectus for "Program Four, Planned Unit Development, Mountain Park, Lake Oswego, Oregon," (Exhibit 75) signed by Lem Nelson, Executive Vice President of Mountain Park Corporation and submitted to the City to obtain the zone change, stated:

"GARDEN APARTMENTS

"Phase four contains 246 garden apartments on two sites containing 12.3 acres just above McNary Parkway. *The design of these units will be similar to those in Phase one. The unit will vary in size from 900 square feet to 1500 square feet* * * *." (Emphasis supplied.)

"single family residential." When that land was annexed to City that zoning continued in effect pursuant to ORS 227.310.[9] The same was true when Arrowood was annexed to Portland.

In *Smith v. County of Washington*, 241 Or 380, 383-84, 406 P2d 545 (1965), the court said:

> "The enabling legislation under which county governments may enact zoning regulations requires the enactment of a comprehensive zoning plan. ORS 215.050. Once a *plan* is adopted, changes *in it* should be made only when such changes are consistent with the over-all objectives of *the plan and in keeping with changes in the character of the area or neighborhood to be covered thereby * * *.*" (Emphasis supplied.)

The above quotation was repeated with approval in *Roseta v. County of Washington*, 254 Or 161, 166, 458 P2d 405 (1969).

The City had the prerogative, if not the duty, of including the land in controversy in a comprehensive zoning ordinance when it was annexed to the City, but only in a *manner provided by law*. ORS 227.310.[9] Part of the law is the rule quoted above from *Smith*, that is, that changes in the existing comprehensive plan be made only in keeping with its overall objectives and changes in the character of the area or neighborhood. This salutary rule is not abrogated by the mere act of annexation to a city.[10]

---

[9] ORS 227.310 provides:
"Zoning or land use ordinances or zoning regulations applicable to any area not within a city shall not cease to apply to the area merely because such area is later included within a city, but shall continue to apply until altered or discontinued by the legislative body of the city *in a manner provided by law*." (Emphasis supplied.)

[10] Lake Oswego Planned-Unit Development enabling ordinance, § 53.130, itself requires a PUD to be compatible with the character of the neighborhood.

In a somewhat similar situation in *Beshore v. Town of Bel Air,* 237 Md 398, 414, 206 A2d 678 (1965), the court said:

> "* * * [A] municipality when it zones its territory should take into consideration the character of the areas immediately surrounding its *borders* * * *." (Emphasis supplied.)

And in *Cresskill v. Dumont,* 15 NJ 238, 247, 104 A2d 441, 445-46 (1954), in a situation where one borough changed a zone in an area on its border with another, the court held:

> "* * * At the very least Dumont owes a duty to hear any residents * * * of adjoining municipalities who may be adversely affected by proposed zoning changes and to give *as much consideration to their rights as they would to those * * * of Dumont. To do less would be to make a fetish out of invisible municipal boundary lines and a mockery of the principles of zoning.*" (Emphasis supplied.)

The City's duty to protect rights of adjacent property owners was accentuated by the physical nature of the plaintiffs' and the subject land in Phase IV. The relative elevation, shape and location of subject land in relation to the remainder of the PUD indicated it was severable from the PUD and more naturally associated with plaintiffs' land.[①] As one witness put it, it was just "an accident of ownership" that the land was part of the PUD.

---

[①] Subject land, according to contour maps in evidence, was on virtually the same elevation as the property of the plaintiffs; namely, between 650 and 730 feet. The elevation to the west rises, and is nearly 1000 feet at the crest of Mt. Sylvania, 2400 feet westerly. Immediately to the east of the 3.5-acre tract where the apartment building was constructed, the elevation drops rapidly to approximately 550 feet.

In *Roseta v. County of Washington,* supra, the court said that *Smith* laid down the principle that

"\* \* \* once the Board has established a zone and thereafter a change in the character of the use is authorized, the usual presumption of legislative regularity is not recognized and in such a case the Board carries the burden of proving that there has been a change in the neighborhood in order to justify the rezoning of a small tract as an amendment in keeping with the comprehensive plan." 254 Or at 166.

We view this rule as controlling in the instant case. This view is consistent with language in *Archdiocese of Port. v. Co. of Wash.,* 254 Or 77, 83, 458 P2d 682 (1969), where the court said:

"Experience has demonstrated that frequently zone changes are made by governing boards without adequate consideration of the effect which the change will have on the over-all plan. It is known that zone changes are commonly made simply because the change is requested and no one in the neighborhood has an objection to it. Knowing this it would not be realistic to presume in a particular case that the governing board acted regularly in the sense that it duly considered the effect which the change would have on the comprehensive plan."

It was, therefore, up to defendants to carry the burden of proving the rezoning of this relatively small tract of land was justified.

We have indicated by the emphasis placed on the quotation from *Smith* that changes in a comprehensive *plan once adopted* should be made only when such changes are consistent with the overall objectives of the plan of which the particular property is a part and in keeping with changes in the character of the area or neighborhood covered. In the case at bar the evi-

dence indicates that little, if any, consideration was given to the Arrowood property owners or the comprehensive zoning which had long covered the entire area and upon which they had a right to rely. In addition to the physical evidence, we note as indicative of this fact that Portland maintained single family residential zoning when it annexed Arrowood. Moreover, when Multnomah County was approached regarding the PUD, the developers were told single family residences would probably be required in the area in question.

Our decision here is intended to have no effect upon comprehensive zoning in a Planned-Unit Development of an homogeneous area of land, an example of which might well be the 600-acre tract involved in the case at bar (Kerr property) without the strip in controversy, assuming the municipal body genuinely takes into consideration preexisting zoning and neighborhood development along its borders.

■ Inasmuch as the trial court in its decision did not consider the question of plaintiffs' remedy the case must be remanded. This question includes a decision whether the apartment building must be removed from the single family residential area, or whether the equities are such that the building should be allowed to remain and judgments rendered for such damages as the evidence indicates should be allowed individual plaintiffs against respective defendants.[20] Defendants may put on evidence on these issues which plaintiffs may rebut.

■ We view this declaratory judgment injunction suit as being in equity. See discussion, Oregon State

---

[20] Here, plaintiffs sought alternative relief—removal of the building or damages if the building was not removed.

Bar, Oregon Civil Pleading & Practice § 85.2. We hold that defendants are foreclosed by their motion to dismiss from putting on evidence on the issue herein decided. *Cole v. Clark,* 241 Or 292, 300, 404 P2d 194, 405 P2d 632 (1965); *Newman v. Stover,* 187 Or 641, 213 P2d 137 (1950).

■ On the issue of damages, the following rulings of the trial court which plaintiffs assign as error are pertinent. The trial court sustained a defense objection in one instance to testimony that a plaintiff's view of Mt. Hood had been destroyed or substantially impaired, because, as the defense insisted, aesthetics could be no basis for plaintiffs' claims. In *Oregon City v. Hartke,* 240 Or 35, 400 P2d 255 (1965), the court recognized aesthetic considerations as pertinent in zoning. *Hartke* was followed in *Perkins v. Marion County,* 252 Or 313, 319, 448 P2d 374 (1968), where it was noted that the county zoning act recognizes aesthetics as a criterion for zoning. ORS 215.055. The view a person may have from his home obviously can affect the market value of the property. For these reasons we believe the trial court must consider the testimony plaintiffs themselves gave as to loss of view in determining the remedy on remand.

■ Plaintiffs produced a real estate broker as a witness on loss of value of their properties. He was unable, after repeated questioning, to give any factual basis for his opinions. There was insufficient basis laid for his opinion evidence. *State Highway Com. v. Arnold et al,* 218 Or 43, 341 P2d 1089, 343 P2d 1113 (1959). The trial court correctly excluded it.

Reversed and remanded for further proceedings consistent with this opinion.